STATE OF NORTH CAROLINA v. JAMES LEO TIDWELL

No. 276A88

(Filed 4 January 1989)

**Homicide § 30.2— murder—failure to instruct on manslaughter—no error**

> The trial court did not err in a first degree murder prosecution by not submitting voluntary manslaughter to the jury where there was no evidence that the stabbing occurred immediately after the provocation, assuming that the provocation was adequate under the law. Moreover, since the jury did not find that defendant was in the grip of sufficient passion to reduce the murder from first to second degree, it would not have found defendant guilty of only voluntary manslaughter.

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Reid, J.*, at the 19 January 1988 Criminal Session of Superior Court, NEW HANOVER County, upon defendant's conviction by a jury of murder in the first degree. Heard in the Supreme Court 15 November 1988.

*Lacy H. Thornburg, Attorney General, by Reginald L. Watkins, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by M. Patricia DeVine, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

On Sunday morning, 27 September 1987, in front of at least three witnesses at a Wilmington gas station, defendant stabbed

and killed his estranged wife, Mavies. Defendant was convicted of first-degree murder and sentenced to life imprisonment.

The State's evidence tended to show the following: Ms. Katherine Williams testified that she had worked with defendant as a postal clerk at the United States Post Office for approximately three years. Defendant was living in the same apartment complex as Ms. Williams' husband. Ms. Williams saw defendant in the parking lot at about 8:00 a.m. on Sunday, 27 September 1987, and invited him in for coffee before he went to church. She testified that defendant was "real upset" and was shaking so badly that he spilled most of the coffee. When Ms. Williams asked defendant why he was upset, he told her that the night before he had caught his wife Mavies with another man. Defendant and his wife had been separated since June 1987. Defendant then said that he was going to kill his wife. Ms. Williams thought that defendant was having a nervous breakdown and offered to take him to the hospital, but he refused. He asked Ms. Williams whether she had a gun, saying that he wanted it to kill Mavies. When Ms. Williams refused to give defendant a gun, he left the apartment, stating that he would stab his wife and that "[w]herever he caught her, he was going to kill her." As defendant walked to his car, Ms. Williams noticed that he had a hunting knife with a black handle and a wide blade. This knife was not the murder weapon.

Travis Perry testified that he baby-sat the three Tidwell children on Saturday night, 26 September 1987. When Mavies Tidwell returned at approximately 12:30 a.m., a female friend who had a male date was with her, but Mavies herself was unaccompanied.

Ms. Dorothea Graham testified that she was working as the cashier at the Gas World on College Road in Wilmington on Sunday, 27 September 1987. At about 9:45 a.m., Mavies Tidwell, accompanied by her youngest child, drove up beside the cashier's booth. She yelled that she was being harassed by a man and that the police should be called. Within two minutes, defendant drove up behind Mrs. Tidwell's car. Shortly thereafter, Mrs. Tidwell drove around to the other side of the cashier's booth, still yelling for Ms. Graham to call the police. As defendant and his wife exchanged words, two customers approached the booth to pay for their purchases. One customer urged Ms. Graham to call the po-

lice. She did so. While making the call, she heard Mrs. Tidwell scream that defendant had a gun. Immediately, the two customers ran. Defendant got out of his car and told Ms. Graham to hang up the telephone. When she obeyed him, defendant went to his wife's car and "just started beating on her." Mrs. Tidwell fought back and screamed for help. Ms. Graham watched them for about five minutes. When she saw blood, she became hysterical, ran out of the cashier's booth, locked the door and jumped into the car of Ms. Evelyn Brown, a customer at the gas station. Ms. Graham last saw Mrs. Tidwell falling out of her car.

Ms. Graham and Ms. Brown drove away to seek help. Unsuccessful, they returned to a restaurant located across the street from Gas World. While there, Ms. Graham saw defendant leave the gas station in a blue car. When the police arrived, Ms. Graham and Ms. Brown returned to the gas station. Mrs. Tidwell was lying on the ground beside her car.

Ms. Brown testified that she bought gas at the Gas World on the morning of 27 September 1987. She was pumping the gas into her car when Mrs. Tidwell drove in yelling for the police to be called because a man was harassing her. Defendant pulled in at the same time as Mrs. Tidwell and parked right behind her. Ms. Brown repeated Mrs. Tidwell's request to Ms. Graham and told Mrs. Tidwell to continue driving until the police arrived. Mrs. Tidwell "drove around one time," but defendant followed her. Mrs. Tidwell stopped her car and asked Ms. Brown to ask defendant what she, Mrs. Tidwell, had done to him. Ms. Brown did so. Defendant stated that Mrs. Tidwell had hit his car. Ms. Brown relayed this statement. Mrs. Tidwell suggested that they wait for the police, but defendant replied that he would not wait and that he would take care of the matter himself. He then got out of his car, went to Mrs. Tidwell's car, pulled her car door open as she attempted to roll up the window and lock the doors, and began fighting with her inside the car. Ms. Brown stepped back and saw defendant pull a knife and begin striking at Mrs. Tidwell while she was still inside the car.

Frightened by what she had seen, Ms. Brown rushed to her car, where she was joined by Ms. Graham. They drove away in an unavailing attempt to get help. From the restaurant across the street from the Gas World, Ms. Brown saw defendant kneeling

over Mavies Tidwell, who was now lying on the ground beside her car. Defendant was stabbing her repeatedly. He eventually stopped and left the scene in his car. When the police and rescue personnel arrived, Ms. Brown returned to the gas station with Ms. Graham. An examination of Mrs. Tidwell's body revealed no vital signs. A knife was located about two feet from the victim's body.

Reverend David E. Duncan testified that he knew the Tidwell family and was aware that Mrs. Tidwell and defendant were separated. On the morning of 27 September 1987, between 9:00 a.m. and 9:15 a.m., defendant visited Reverend Duncan at the First Wesleyan Church. While they were talking privately, the Reverend heard the voices of Mrs. Tidwell and her children in the church parking lot. Defendant immediately left the church by a back door. He returned at approximately 10:15 a.m. Reverend Duncan heard defendant shout, "Pastor David . . . I killed Mavies." Reverend Duncan approached defendant, who again told him that he had killed his wife. Defendant's clothing from the knees down was covered with blood and so were his hands. Because the congregation was gathering for Sunday morning service, Reverend Duncan helped defendant into the parking lot, where he remained with him until the police and rescue unit arrived.

Patrick Falvey, a volunteer rescue worker, testified that his rescue unit responded to a reported accident at the First Wesleyan Church on the morning of 27 September 1987. Falvey observed defendant sitting in the church parking lot with blood on his hands and pants. Falvey asked defendant if he had been in an accident and if he was hurt. Defendant replied, "No, no, no." He stated that he had just killed his wife. Falvey asked defendant if he was sure that was what had happened. Defendant replied, "I killed my wife." In response to further questions, defendant stated that he had stabbed his wife at a gas station. Falvey remained with defendant until law enforcement officers arrived.

Officer J. T. Rogers testified that he placed defendant inside a patrol car and strapped the seat belt around him. Defendant then said, "Officer, I killed my wife." He asked about his wife's condition, but Officer Rogers had no information to give him. Defendant was taken to the police department.

Dr. Charles L. Garrett, pathologist and medical examiner for the State, performed an autopsy on Mrs. Tidwell's body. He observed multiple stab wounds, eighteen in the chest and three in the abdomen, as well as several superficial wounds on the hands, considered to be defensive wounds. In Dr. Garrett's opinion, Mrs. Tidwell's death resulted from "stab wounds to her chest that lacerated her heart from which she bled to death."

Officer Roger Henderson testified that during investigation of the case, he observed the two cars which defendant and Mrs. Tidwell had been driving. He could not determine when the damage to defendant's car occurred, but he considered that the damage to the right front fender of Mrs. Tidwell's car was "old damage."

Defendant presented no evidence at trial. The case was tried as a capital case, and the trial court instructed the jury on first- and second-degree murder. The jury found defendant guilty of first-degree murder and recommended that he be sentenced to life imprisonment.[1] The trial court so sentenced defendant.

---

1. During the sentencing phase of the trial, the jury found as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (1988). The jury found three statutory mitigating circumstances: (1) that the capital felony was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (1988); (2) that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6) (1988); and (3) that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1) (1988). The jury also found nine nonstatutory mitigating circumstances: (1) that defendant expressed remorse for the commission of the crime; (2) that defendant sought forgiveness from God following the commission of the crime; (3) that defendant acknowledged his guilt to a law enforcement officer at an early stage in the criminal process; (4) that defendant served three years in the United States Army and was honorably discharged; (5) that defendant sought counseling for his problems prior to the commission of the crime; (6) that defendant has been, since his incarceration, a good prisoner; (7) that defendant, following the commission of the crime, sought the assistance of his pastor to effect his surrender to the police; (8) that the defendant worked for the United States Postal Service for many years up to the date of the commission of the crime; and (9) that defendant maintained a good relationship with his three minor children prior to and subsequent to the commission of the crime. N.C.G.S. § 15A-2000(f)(9) (1988). The jury considered but did not find as a mitigating circumstance that defendant did not intend to inflict unnecessary pain on the victim above that required to cause her death. As required by N.C.G.S. § 15A-2000(b), after failing to find beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstances, the jury recommended that the trial court impose on the defendant a sentence of life imprisonment. The trial court so sentenced defendant.

On appeal, defendant brings forward one assignment of error. He contends that the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter. Defendant argues that from the evidence presented at trial, the jury could have inferred the following version of the events. Defendant "went to pieces" when he caught his wife with another man. The next day, his co-worker, Ms. Williams, thought that he was having a nervous breakdown. Distraught and angry, defendant followed his wife to get an explanation from her after she deliberately hit his car with hers. Furious, he went over to her car at the gas station and produced a knife, at first only to intimidate her. After his wife continued to hit him, he became enraged and out of control. He began to stab her again and again, deciding *as he was doing it* to kill her. Defendant maintains that this scenario could have been found by a rational jury on the facts of this case. He contends that, notwithstanding his failure to request a jury instruction on voluntary manslaughter and the jury's verdict of first-degree murder, this possible verdict should have been submitted to the jury. We disagree.

Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Fleming*, 296 N.C. 559, 562, 251 S.E. 2d 430, 432 (1979). "One who kills a human being while under the influence of passion or in the heat of blood produced by adequate provocation is guilty of manslaughter." *State v. Wynn*, 278 N.C. 513, 518, 180 S.E. 2d 135, 139 (1971). If any evidence of heat of passion on sudden provocation exists, either in the State's evidence or that offered by the defendant, the trial court must submit the possible verdict of voluntary manslaughter to the jury. *State v. Weeks*, 322 N.C. 152, 173, 367 S.E. 2d 895, 908 (1988). The determinative factor is the presence of such evidence. *State v. Fleming*, 296 N.C. at 562, 251 S.E. 2d at 432.

To have been properly entitled to a jury instruction on voluntary manslaughter, defendant was required either to offer his own evidence or to rely upon the State's evidence to show (1) that he stabbed his wife in the heat of passion, (2) that his passion was provoked by acts of his wife which the law regards as adequate provocation, and (3) that the stabbing occurred immediately after the provocation. *State v. Weeks*, 322 N.C. at 173, 367 S.E. 2d at

908; *see also State v. Robbins,* 309 N.C. 771, 778, 309 S.E. 2d 188, 192 (1983). This he clearly failed to do.

The State's evidence showed that shortly after 8:00 a.m. on Sunday, 27 September 1987, after telling his co-worker that he had caught his wife with another man the night before, defendant asked for a gun with which to kill his wife. When Ms. Williams declined to give him a gun, defendant stated that he would stab Mavies and that "[w]herever he caught her, he was going to kill her." Even assuming that defendant did discover that his wife was with another man the previous night and that, notwithstanding their four-month separation, his wife's conduct was adequate provocation under the law, the evidence does not show that the stabbing occurred *immediately* after defendant's discovery. According to the baby-sitter, Mavies Tidwell returned home unaccompanied at approximately 12:30 a.m. on 27 September 1987. Nearly seven and one-half hours elapsed before defendant made explicit statements to Ms. Williams about his intention to kill his wife. At approximately 9:00 a.m. that same morning, defendant met privately with Reverend Duncan at the church for about twenty-five minutes. When he heard the voices of his wife and children, defendant left by a back door. Shortly thereafter, defendant apparently pursued his wife by car until he caught her at the Gas World. The cashier there testified that defendant looked normal rather than angry or crazy when he went to his wife's car. Defendant then stabbed his wife repeatedly after she had been felled and rendered helpless. We note that the damage to Mrs. Tidwell's car was considered "old," thus raising the implication that no recent collision had occurred. The record fails to show that Mrs. Tidwell was the aggressor at any time. Rather, the evidence demonstrates that defendant had ample time to consider his actions. We conclude that there was no evidence tending to show that the stabbing occurred "so soon after the provocation that the passion of a person of average mind and disposition would not have cooled." *State v. Robbins,* 309 N.C. at 778, 309 S.E. 2d at 192. Absent any evidence to support it, a trial court is not required to charge the jury on the question of a defendant's guilt of a lesser degree of the crime charged. *State v. Wingard,* 317 N.C. 590, 346 S.E. 2d 638 (1986).

Even assuming arguendo that the evidence supported an instruction on voluntary manslaughter, the trial court's failure to give it would have been harmless error.

In *State v. Freeman*, 275 N.C. 662, 170 S.E. 2d 461 (1969), the defendant alleged an error in the trial court's instructions on voluntary manslaughter and an error in the court's refusal to instruct on involuntary manslaughter. The court properly instructed on murder in the first degree and murder in the second degree and the jury returned a verdict of guilty of murder in the first degree. This Court, in finding no error in the defendant's trial, stated:

> A verdict of murder in the first degree shows clearly that the jurors were not coerced, for they had the right to convict in the second degree. That they did not indicates their certainty of his guilt of the greater offense. The failure to instruct them that they could convict of manslaughter therefore could not have harmed the defendant.

*Id.* at 668, 170 S.E. 2d at 465. *See also State v. Fowler*, 285 N.C. 90, 203 S.E. 2d 803 (1974), *death sentence vacated*, 428 U.S. 904, 49 L.Ed. 2d 1212, 96 S.Ct. 3212 (1976).

*State v. Judge*, 308 N.C. 658, 664-65, 303 S.E. 2d 817, 821-22 (1983). Since the jury in the case sub judice did not find that defendant was in the grip of sufficient passion to reduce the murder from first-degree to second-degree, then ipso facto it would not have found sufficient passion to find the defendant guilty only of voluntary manslaughter. The trial court did not err in failing to give the jury an instruction on voluntary manslaughter.

Defendant received a fair trial, free from error.

No error.