STATE OF NORTH CAROLINA v. PHILLIP NOVELL WIGGINS

No. 342A91

(Filed 2 July 1993)

1. **Criminal Law § 91 (NCI4th) — probable cause hearing — refusal to hold — no prejudicial error**

There was no prejudicial error in a first-degree murder and robbery prosecution where defendant was arrested pursuant to a warrant on 11 April, his initial appearance was on 12 April and counsel was appointed, a probable cause hearing was set for 26 April but was not held, defendant filed two motions requesting a probable cause hearing on 10 August, both motions were denied, and the grand jury returned true bills on 17 August. Although there is no constitutional right to a probable cause hearing, N.C.G.S. § 15A-606 requires a judge to schedule a probable cause hearing not later than

15 working days following the initial appearance. Assuming that this statute provides additional rights which were violated in this case, that violation was not prejudicial because defendant was arrested upon a warrant and tried upon true bills of indictment, so that both the magistrate and the grand jury had the duty to determine the existence of probable cause, and defendant points to no evidence to support a finding of prejudice other than the passage of time following his arrest, but does not explain how he was prejudiced by this passage of time.

**Am Jur 2d, Criminal Law §§ 411-420.**

2. **Evidence and Witnesses § 1235 (NCI4th)— statement to S.B.I. agent—Miranda warnings not given—no custodial interrogation**

The trial court did not err in a prosecution for first-degree murder and robbery by denying defendant's motion to suppress his statement to an S.B.I. agent where defendant was interviewed by the agent on the day the victim's body was found; the interview was part of police efforts to gather information from persons who had visited the victim's home the day before; officers had spoken with Jeffrey Moore and Stephon Marshburn before speaking with defendant; Moore and Marshburn told officers that they had been at the victim's home on the previous day with defendant and about fifteen others and that the victim was alive when Moore, Marshburn and defendant left; the police had no evidence implicating defendant in the murder at the time of the interview and they considered him a potential witness rather than a suspect; there was nothing to suggest that defendant was in custody or that defendant was deprived of his freedom of action in any significant way; and the totality of the circumstances suggests that defendant's statement to the agent was not involuntary.

**Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 555-557, 614.**

**What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

STATE v. WIGGINS

[334 N.C. 18 (1993)]

3. **Constitutional Law § 344 (NCI4th) — first-degree murder — voir dire — judge's private communication with prospective alternate juror — harmless error**

The State met its burden of showing that the trial court's error was harmless beyond a reasonable doubt where the judge conferred with a prospective juror during jury selection, the prospective juror asked that she be excused from jury duty because she was due to begin university classes, the court told her that she should inform the parties of her situation and allow them to take care of it, she was called to the jury box during the selection of alternate jurors, and she was excused by consent of both parties. The trial court immediately reconstructed its conversation for the record, there is nothing to raise any doubt as to the completeness or accuracy of the trial court's reconstruction, the prospective juror was ultimately excused by consent of both the State and defendant, and it did not become necessary for any alternate juror to serve on defendant's jury.

**Am Jur 2d, Criminal Law §§ 695, 696.**

4. **Appeal and Error § 147 (NCI4th) — first-degree murder — excusal of prospective alternate juror for cause — no objection — no request to rehabilitate**

Defendant in a first-degree murder and robbery prosecution waived the issues of whether the trial court erred by excusing a prospective alternate juror upon its own motion and in refusing to allow defendant to rehabilitate that juror where defendant did not object to the excusal for cause and did not make a request to rehabilitate the prospective juror. Moreover, it did not become necessary for any alternate juror to serve on defendant's jury and any possible error could not have been harmful to defendant.

**Am Jur 2d, Appeal and Error §§ 545 et seq.**

5. **Jury § 252 (NCI4th) — first-degree murder — jury selection — peremptory challenges — black jurors excluded — no error**

A first-degree murder defendant's *Batson* challenge was properly denied by the trial court where the State used peremptory challenges against four black prospective jurors; the State voluntarily proffered explanations for the exercise of each peremptory challenge; the explanations offered by the State,

if not offered as a pretext, constitute valid non-racial reasons
for the exercise of peremptory challenges; the record supports
the conclusion that the explanations were not a pretext in
that the prosecutor's concerns about the four prospective jurors
arose from their uncertainties about the death penalty or their
potential bias resulting from prior contact with defense counsel,
defendant, the victim, or his family members; and defendant
offered no evidence to show that any reason offered by the
State was a pretext.

**Am Jur 2d, Jury §§ 265 et seq.**

6. **Evidence and Witnesses § 1942 (NCI4th) — first-degree
   murder — letter written by defendant — authentication**
   There was sufficient evidence to support the trial court's
   admission of a letter into evidence where the letter was pur-
   portedly written by defendant and received by a witness while
   the witness was in prison, the letter was printed rather than
   written in cursive lettering, and defendant contends that it
   is impossible to reliably identify printing, so that the letter
   was not properly authenticated. The witness testified on voir
   dire and again before the jury that he recognized defendant's
   handwriting, having received another letter from defendant
   and having seen some songs which defendant had written,
   all of which were printed. N.C.G.S. § 8C-1, Rule 901, N.C.G.S.
   § 8C-1, Rule 104(e).

**Am Jur 2d, Evidence §§ 878-883.**

7. **Robbery § 4.3 (NCI3d) — armed robbery — evidence sufficient**
   There was sufficient evidence that defendant committed
   a robbery with a dangerous weapon where there was evidence
   that defendant was in possession of money apparently belong-
   ing to the victim when Moore and Mewborn entered the vic-
   tim's home; defendant said that he "already had it" when
   Mewborn asked where the money was; the victim appealed
   to his attackers to take the money and the beer and leave
   while Mewborn was attempting to get the money from defend-
   ant; and there was evidence that defendant was in possession
   of a gun at that time.

**Am Jur 2d, Robbery §§ 5, 63.**

8. **Homicide § 256 (NCI4th) — murder — premeditation and deliberation — evidence sufficient**

There was sufficient evidence of first-degree murder based on premeditation and deliberation where there was evidence that defendant was present when Mewborn first shot the victim; that defendant said "Man, you got to kill him . . ." after Mewborn shot the victim with his single shot rifle; defendant complied with Mewborn's demand for more bullets by obtaining bullets from Moore after threatening him by pointing a gun in his face; and Moore heard two more shots as he was running from the scene. There was direct evidence that defendant was present at the scene at the time of the initial assault, advocated the killing, and stood ready to support Mewborn in completing the homicide, and circumstantial evidence to suggest that two guns were fired, permitting an inference that defendant fired one of the fatal shots.

**Am Jur 2d, Homicide §§ 437 et seq.**

9. **Homicide §§ 558, 571 (NCI4th) — first degree murder — refusal to charge on manslaughter — no error**

There was no error in a first-degree murder prosecution where the court charged on second-degree murder at defendant's request but refused to charge the jury on voluntary and involuntary manslaughter. All of the State's evidence, if believed, tended to establish first-degree murder and not manslaughter, there was no evidence of self-defense, and defendant's evidence, if believed, would show that he was not guilty of any crime. Moreover, any error was harmless because the jury was instructed on second-degree murder and still found defendant guilty of first-degree murder.

**Am Jur 2d, Homicide §§ 525 et seq.**

10. **Criminal Law § 959 (NCI4th) — murder — motion for appropriate relief — newly discovered evidence — known at time of trial**

The trial court did not abuse its discretion in denying defendant's motion for appropriate relief based on newly discovered evidence in a murder prosecution where the trial court's findings, which were supported by sufficient evidence, were that defendant and Mewborn were both housed in the Common Jail of Lenoir County awaiting trial for the murder, defendant informed Mewborn that he did not want him to

STATE v. WIGGINS

[334 N.C. 18 (1993)]

testify in his case since Mewborn could then face the death penalty, defendant informed Mewborn during the trial that he was being railroaded, defendant's attorneys interviewed Mewborn during the trial to see if he had any information which would assist defendant, and Mewborn responded in the negative, although he later testified at the hearing that he knew at the time that defendant was not involved in the killing. The trial court concluded that the information was known and available to defendant at the time of trial.

**Am Jur 2d, Coram Nobis and Allied Statutory Remedies § 50.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Barefoot, J., at the 13 May 1991 Criminal Session of Superior Court, Lenoir County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for robbery with a dangerous weapon was allowed 12 February 1992. Heard in the Supreme Court 7 October 1992.

*Lacy H. Thornburg, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*William D. Spence and T. Dewey Mooring, Jr., for defendant.*

FRYE, Justice.

Defendant, Phillip Novell Wiggins, was indicted for first-degree murder, robbery with a dangerous weapon, and as a habitual felon. Defendant was tried capitally to a jury, which returned a verdict of guilty of first-degree murder based on malice, premeditation and deliberation. Defendant was also found guilty of robbery with a dangerous weapon. The jury found defendant not guilty of first-degree murder under the felony murder rule. After finding that there were no statutory aggravating circumstances to be submitted to the jury, the trial court imposed the mandatory sentence of life imprisonment for the first-degree murder conviction. Defendant admitted habitual felon status and was sentenced as a habitual felon to life imprisonment for robbery with a dangerous weapon.

Defendant gave written notice of appeal to this Court on 24 May 1991. After filing his record on appeal and brief with this Court, defendant filed a motion for appropriate relief with this

Court claiming newly discovered evidence that would entitle him to a new trial. By Order dated 18 December 1992, this Court remanded the cause to the Superior Court, Lenoir County, for an evidentiary hearing on defendant's motion. By Order filed 22 January 1993, after an evidentiary hearing, Judge James D. Llewellyn denied defendant's motion. Both defendant and the State filed supplemental briefs with this Court addressing whether the trial court correctly denied defendant's motion for appropriate relief. After reviewing the transcript of the hearing and considering their supplemental briefs, we conclude that the trial court properly denied defendant's motion for appropriate relief. On his direct appeal, we conclude that defendant received a fair trial, free from prejudicial error.

I.

Richard Ivey Sutton was murdered in the early morning hours on 10 April 1990 at his home on Orion Street in Kinston. Sutton operated a "liquor house" from his home which defendant and friends had visited on the evening of 9 April 1990 and the morning of 10 April 1990.

Jeffrey Moore, who was in custody as a result of charges against him relating to the murder of Sutton, was the main witness for the State and testified to the following facts at trial. Moore lived with Stephon Marshburn in a mobile home in April of 1990. William Mewborn, Renee Croom and defendant Phillip Novell Wiggins also lived there. The mobile home was located close to the victim's home.

On the evening of 9 April 1990 Moore, Marshburn, Mewborn and defendant spent time at the victim's home drinking beer. They left around 11:00 p.m. and returned to Marshburn's home to watch television. Soon thereafter an argument between Mewborn and his girlfriend Gloria developed into an altercation. During the altercation, Gloria cut Mewborn on the arm. She then left Marshburn's home with defendant accompanying her.

Defendant later returned to Marshburn's home and warned the others that Gloria was going to "get her ex-boyfriend" who was "coming back to the trailer." Marshburn left his home to visit his neighbor "Champ" who was in possession of various firearms. Marshburn and Champ returned to Marshburn's home with six .22 caliber rifles and one sawed-off shotgun. Each gun was loaded

and held only one bullet. The men waited outside for the anticipated attackers, but no one ever arrived. The group eventually abandoned their guard and retreated inside the mobile home.

At about 3:30 a.m. the men visited the victim's home again for a short time and then returned to Marshburn's home. Around 4:00 a.m., defendant went to the store at Moore's request to buy cigarettes for Moore. Defendant took his gun with him. After defendant had been away for about an hour, Moore and Mewborn decided to go out to look for him. They also took their guns with them.

They went to the victim's home and knocked on the door. After a delay, the victim answered. They walked in and proceeded to the kitchen. Defendant was there and his gun was nearby on the kitchen counter. Moore asked the victim to get a beer for him and Mewborn. The victim did not respond. However, defendant picked up a bag from the counter and told Moore and Mewborn that "he already had it." Mewborn then asked "where the money was." Defendant reached in his pocket and pulled out loose money and said he "already had it." Mewborn demanded that defendant give him the money. Defendant did not respond, so Mewborn grabbed him by the collar and again demanded that defendant give him the money. In the meantime, the victim told the men to "take the beer and the money and leave." Mewborn told the victim to shut up and pointed the gun at his face. Mewborn then shot the victim between the eyes.

Mewborn then told Moore and defendant that "he couldn't leave [the victim] like this; that the victim was going to tell on" them. Mewborn asked defendant to give him more bullets. Defendant had none, so defendant obtained some from Moore who was on his way out the door. Moore testified that defendant "pointed his gun in my face and told me to give him some more bullets." Moore gave him about fifteen bullets and then ran out of the victim's home. He heard two more shots, "a couple of seconds apart," on his way out.

Moore went to Marshburn's home and told Marshburn what had happened. Mewborn and defendant arrived about five minutes later. Mewborn was yelling at defendant about the money. Defendant finally gave Mewborn the money. At various points both Mewborn and defendant threatened to kill Moore because he might "say something."

Moore left Marshburn's home but returned around 6:00 a.m., at which time Mewborn was asleep. Marshburn said he wanted to see the victim, so Moore accompanied Marshburn to the victim's home. While they were there, a man who identified himself as the victim's cousin arrived and asked to see the victim. Moore and Marshburn informed him that Sutton was dead. After a few minutes, the three men drove to the police station to alert the authorities. A policeman arrived on the scene shortly thereafter. Moore informed the police that he and Marshburn visited the victim's home in order to buy beer and that they found the victim dead upon their arrival. On 11 April 1990, police visited Marshburn's home and told Moore, Marshburn, Mewborn, Croom and defendant that they needed to talk to them. On that day, Moore told the police everything that had happened. He was arrested shortly thereafter.

William L. Slaughter, Special Agent with the State Bureau of Investigation (S.B.I.), testified that, on the evening of 10 April 1990, he located defendant at Marshburn's residence and transported him to the Kinston Police Department. Defendant gave a statement in which he claimed that, following Mewborn's argument with his girlfriend, he had remained at Marshburn's home for the rest of the morning.

Stephon Marshburn testified that early on 10 April 1990, while Mewborn and defendant were arguing, Moore told him that Moore, Mewborn and defendant had been at the victim's home and that Mewborn had shot the victim. Marshburn "laughed it off" because he did not believe Moore. Later, Marshburn followed Mewborn and defendant into the bedroom where he saw one- and five-dollar bills all over the bed. Defendant repeatedly asked Mewborn to give him the money but Mewborn refused. Defendant told Marshburn that Mewborn asked the victim for money, the victim refused and the gun accidentally went off in the victim's face. Defendant said he told Mewborn, "Man, you got to kill him because the guy is suffering." Defendant told Marshburn that he then left. Marshburn testified that he and defendant then decided to take the guns apart and throw them out.

Defendant testified that late on 9 April 1990 until early on 10 April 1990 he was at the victim's home. Thereafter he returned to Marshburn's home. He stated that while watching television he fell asleep between 4:30 and 5:00 a.m. on 10 April 1990 and

did not awake until 8:00 or 9:00 a.m. He said that he knew nothing about the killing other than what he had heard since he had been in police custody.

Additional evidence will be discussed as it becomes relevant to a fuller understanding of the specific issue raised on appeal.

II.

[1] Defendant first contends that the trial court erred by refusing to require the State to conduct a probable cause hearing. Defendant was arrested pursuant to a warrant on 11 April 1990. Defendant's initial appearance was held on 12 April 1990 and counsel was appointed at that time to represent him. A probable cause hearing was set for 26 April 1990, in accordance with N.C.G.S. § 15A-606. However, the scheduled probable cause hearing was not held. On 10 August 1990, defendant filed two motions requesting a probable cause hearing, both of which were subsequently denied. On 17 August 1990, the grand jury returned true bills of indictment upon which defendant was tried.

We have held that there is no constitutional right to a probable cause hearing. See State v. Oliver, 302 N.C. 28, 38, 274 S.E.2d 183, 190 (1981); State v. Lester, 294 N.C. 220, 224, 240 S.E.2d 391, 396 (1978). However, N.C.G.S. § 15A-606 requires a judge to schedule a probable cause hearing not later than fifteen working days following the initial appearance. N.C.G.S. § 15A-606 (1988). Assuming without deciding that this statute was designed to provide a defendant with additional rights, and that those rights were violated in this case, see State v. Siler, 292 N.C. 543, 555, 234 S.E.2d 733, 741 (1977), we hold that defendant has failed to show prejudicial error.

Prejudicial error in regard to rights arising other than under the Constitution of the United States is shown "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]" N.C.G.S. § 15A-1443(a) (1988). Defendant was arrested upon a warrant and was tried upon true bills of indictment. Both the magistrate and the grand jury had the duty to determine the existence of probable cause. See State v. Hudson, 295 N.C. 427, 430-31, 245 S.E.2d 686, 689 (1978); N.C.G.S. § 15A-304(d); N.C.G.S. § 15A-628. As in State v. Hudson, "in the case sub judice, probable cause that a crime was committed and that defendant committed it was twice established." Hudson, 295 N.C. at 430, 245 S.E.2d at 689.

Defendant points to no evidence in the record to support a finding of prejudicial error other than the passage of time following his arrest. He does not explain how he was prejudiced by this passage of time. Thus, we find no prejudicial error in the denial of defendant's motions for a probable cause hearing.

[2]  Defendant next contends that the trial court erred in denying defendant's motion to suppress his statement to S.B.I. Special Agent William Slaughter. Defendant contends that the statement was inadmissible because he had not been properly advised of his *Miranda* rights before it was given and because his statement was involuntary. *See Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966); *Rogers v. Richmond*, 365 U.S. 534, 5 L. Ed. 2d 760 (1961). We reject this assignment of error because the record fails to reveal any evidence to support defendant's contentions.

*Miranda* warnings are required prior to questioning only if one is in custody or has been deprived of one's freedom of action in a significant way. *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706; *State v. Perry*, 298 N.C. 502, 506, 259 S.E.2d 496, 499 (1979). Whether or not *Miranda* warnings are required or given, the Fourteenth Amendment requires that a statement be voluntary in order to be admissible. *Rogers v. Richmond*, 365 U.S. at 540, 5 L. Ed. 2d at 766. In order to determine the voluntariness of a statement, we must assess the "totality of all the surrounding circumstances[.]" *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862 (1973).

The State presented evidence at the pretrial hearing on defendant's motion to suppress which tended to show the following. Defendant was interviewed by Agent Slaughter on 10 April 1990, the day the victim's body was found. The interview was part of police efforts to gather information from persons who had visited the victim's home on 9 April 1990. Prior to speaking with defendant, police officers had spoken with Jeffrey Moore and Stephon Marshburn. Moore and Marshburn told the officers that they had been at the victim's home on 9 April 1990 with defendant and approximately fifteen other persons and that the victim was alive when Moore, Marshburn and defendant left. At the time of the interview, the police had no evidence implicating defendant in the murder, and they considered him to be a potential witness rather than a suspect. The interview lasted approximately thirty minutes, after which time defendant left the police station.

Defendant offered no evidence at the hearing.

We find nothing in the evidence to suggest that defendant was "in custody" as that term has been interpreted by this Court. *See State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986) (defendant was not in custody when he voluntarily accompanied law enforcement officers in order to be questioned about a crime to which he later confessed); *State v. Martin*, 294 N.C. 702, 242 S.E.2d 762 (1978) (defendant was not in custody when he voluntarily went to the police station and made a statement). Nor was there evidence tending to show that defendant was deprived of his freedom of action in any significant way. Furthermore, the totality of the circumstances suggests that defendant's statement to Agent Slaughter was not involuntary. *See State v. Wilson*, 322 N.C. 91, 366 S.E.2d 701 (1988) (statement was not involuntary where the officer did not frighten defendant, overcome his will, or make promises to him); *State v. Corley*, 310 N.C. 40, 311 S.E.2d 540 (1984) (inculpatory statements which were not made as a result of any fear or hope of reward were voluntary and admissible). Thus, there was no error in denying defendant's motion to suppress.

[3] In his third assignment of error, defendant contends that the trial court erred by talking to a potential juror outside the presence of defendant, his attorneys, and the district attorney. Defendant argues that his unwaivable right to be present at all stages of his capital trial was infringed upon when the trial judge conferred with a prospective juror (Ms. B.) during jury selection.

The record shows that after the judge spoke with Ms. B. during jury selection, defendant moved for a mistrial on that basis. In ruling on defendant's motion for a mistrial, the trial judge said:

> All right. Let the record reflect that the juror requested that she be excused from jury duty because she is enrolled at East Carolina University and is to begin her classes at 5:00 Monday afternoon. The court disallowed her request and told her that if she were to be called on this jury, that she should inform both parties that was her situation. And then I would let you take care of it. Your motion is denied.

Later, during selection of alternate jurors, Ms. B. was called to the jury box and was excused by consent of both parties.

This Court has recognized that a capital defendant has an unwaivable right to be present at all stages of his capital trial.

*State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). The capital defendant's right to be present during all stages of his trial attaches to "preliminary questioning in open court at, during and in the context of defendant's trial of newly summoned prospective jurors called specifically for service in defendant's trial." *State v. Payne*, 328 N.C. 377, 388, 402 S.E.2d 582, 588 (1991) (citing *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990) ). Thus, defendant's right to be present was clearly violated in this case when the trial court communicated privately with Ms. B. However, whether a violation of defendant's right to be present constitutes prejudicial error is subject to harmless error analysis. *State v. Hudson*, 331 N.C. 122, 135, 415 S.E.2d 732, 738 (1992).

We find that the State has met its burden in this case by showing that the trial court's error was harmless beyond a reasonable doubt. The trial court immediately reconstructed its conversation with Ms. B. for the record. *See Hudson*, 331 N.C. at 137, 415 S.E.2d at 739 (error, if any, was harmless where trial court recounted *ex parte* communications with jurors for the record). The conversation related to a scheduling problem faced by the prospective juror. As in *Hudson*, we find nothing to raise any doubt as to the completeness or accuracy of the trial court's reconstruction. *Id.* at 137, 415 S.E.2d at 739-40. In finding harmlessness, we also note that this prospective juror was ultimately excused by consent of both the State and defendant. In addition, it did not become necessary for any alternate juror to serve on defendant's jury. Because the alternate jurors did not participate in the jury deliberations, the excusal of the prospective juror with whom the judge had spoken in no way affected defendant. Under the circumstances, we find that the error was harmless beyond a reasonable doubt.

[4] Defendant next contends that the trial court erred in excusing a prospective alternate juror upon its own motion and in refusing to allow defendant to rehabilitate the prospective juror. The transcript shows that the trial court excused prospective juror Mr. P. for cause after Mr. P. stated in response to the State's voir dire questioning that he would find it hard to believe the testimony of witnesses who were presently prisoners. Defendant did not object to the trial court's excusal for cause of the prospective juror, therefore, defendant failed to preserve this issue for appellate review. N.C. R. App. P. 10(b)(1). Similarly, defendant did not make a request to rehabilitate the prospective juror. Thus, his contention that the trial court erred in not allowing him to

do so is similarly waived. *Id.* As observed earlier, it did not become necessary for any alternate juror to serve on defendant's jury. Thus, any possible error in excusing the prospective alternate juror could not have been harmful to defendant.

[5] In his next assignment of error, defendant argues that his federal and state constitutional rights were violated by the State's peremptory challenges to four black jurors solely on account of their race. Such discrimination is prohibited under the Fourteenth Amendment to the United States Constitution and under Article I, Section 26 of the Constitution of North Carolina. *See Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986); *State v. Crandell*, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988).

In a challenge under *Batson*, a defendant must first establish a *prima facie* case of purposeful discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88. Once the defendant makes his *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for having peremptorily challenged those jurors. *Id.* at 97, 90 L. Ed. 2d at 88. This Court has applied these principles and has permitted a third step in the analysis, specifically, that of allowing a defendant to introduce evidence that the State's explanations are merely a pretext. *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991).

In this case, the State voluntarily proffered explanations for the exercise of each peremptory challenge which resulted in the excusal of a black prospective juror. When the State voluntarily proffers explanations for its challenges, we proceed as if a *prima facie* case of purposeful discrimination has been established. *Id.* at 17, 409 S.E.2d at 297. The standard which the State must meet in rebuttal has recently been discussed and will not be repeated here. *See id.* Rather we turn directly to the reasons offered by the State for peremptorily challenging each of the four black jurors.

M.D. was the first black prospective juror peremptorily challenged by the State. The State explained that M.D. was excused because she expressed some ambivalence about her ability to recommend imposition of the death penalty upon a finding of guilty. In support of this explanation, the record reveals the following exchange:

Q. [The assistant district attorney]: Do you feel after everything in this case and at the very end of the case, if in fact Mr.

Wiggins has been found guilty of first degree murder, and then after you have gone in the back room again in the second phase; do you feel as if you could sign your name to a verdict sheet imposing the death penalty if you feel as though it should be applied in this case?

A. [Prospective Juror M.D.]: No.

Q. You don't feel like you could do that?

A. Huh-Uh.

The exchange reveals that the juror at least possessed uncertainty about her willingness to impose the death penalty. This constitutes a valid non-racial reason for the State to excuse her peremptorily. *See State v. Smith*, 328 N.C. 99, 125, 400 S.E.2d 712, 727 (1991). Thus, the State has met its burden of showing that this peremptory challenge was not exercised for a racial purpose.

A second black prospective juror who was peremptorily challenged was H.D. On voir dire, H.D. stated that he knew William D. Spence, one of the defense attorneys, and that he had retained Mr. Spence to represent him in a legal matter. The prosecutor explained that he was excusing H.D. on the basis that H.D. may retain some bias in favor of his former attorney and thus in favor of defendant. The prosecutor excused a third black prospective juror, J.P., because she knew both the defendant and the victim and had engaged in social activities with the defendant. The fourth prospective black juror who was excused, M.G., stated on voir dire that she knew the victim, the victim's stepbrother and the victim's sister. She also stated that she had seen the victim's stepbrother and the victim's sister in the previous weeks but she did not know anything about the case, although she "may have . . . probably" discussed the case with the victim's sister. The explanations offered by the State in regard to these three prospective jurors, if not offered as a pretext, constitute valid non-racial reasons for the exercise of peremptory challenges. *Id.* at 124, 400 S.E.2d at 726.

We next address defendant's argument that each explanation offered by the State was merely a pretext. *See State v. Porter*, 326 N.C. 489, 498-99, 391 S.E.2d 144, 150-51 (1990) (for identification of factors to which a judge should refer in determining whether explanation is legitimate or a pretext). The record in this case permits a conclusion that the prosecutor was "primarily concerned

with removing jurors who might not be able to give defendant and the State a fair trial." *Smith*, 328 N.C. at 126-27, 400 S.E.2d at 727. The prosecutor's concerns about the four prospective jurors who were challenged arose in response to the jurors' uncertainties about the death penalty, or their potential bias resulting from prior contact with defense counsel, the defendant or the victim and his family members. We observe, in addition, that defense counsel proffered no evidence to show that any reason offered by the State was a pretext. *See Porter*, 326 N.C. at 501, 391 S.E.2d at 152 (defense counsel was apparently satisfied by the explanations offered by the State because no effort was made by the defense to demonstrate that the explanations were pretext). We hold that the record supports the trial court's conclusion that the State's explanations were legitimate and not a pretext. Defendant's *Batson* challenge was properly denied by the trial court.

[6] Defendant next complains that the trial court erred in admitting into evidence a letter purportedly written by defendant. The handwritten letter, allegedly written by defendant and received by Jeffrey Moore while Moore was in jail in Craven County, was written in printed rather than cursive lettering. Defendant contends that it is impossible to reliably identify one's "printing," thus the letter was not properly authenticated, making it error to admit the letter into evidence. We disagree.

Defendant objected prior to the State's introduction of the letter into evidence on the ground that the State could not properly authenticate the letter. The trial court held a voir dire hearing on this issue. Moore testified on voir dire and again before the jury that he knew the letter was from defendant because he recognized defendant's handwriting. He explained that he had received another letter from defendant while he was in jail and that he had also seen some songs which defendant had written. Moore testified that the other letter and the songs were also printed. After determining that there was sufficient evidence of authenticity to admit the letter into evidence, the trial court overruled defendant's objection.

At common law, a witness was permitted to give his opinion on the authenticity of a contested writing "based on previous sufficient observation." *State v. LeDuc*, 306 N.C. 62, 68, 291 S.E.2d 607, 611 (1982), *overruled in part by State v. Childress*, 321 N.C. 226, 362 S.E.2d 263 (1987). Today, under N.C.G.S. § 8C-1, Rule

901(a), "[t]he requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." By way of illustration, the rule specifically recognizes that a non-expert may offer an opinion as to the genuineness of handwriting if that witness has acquired familiarity with the handwriting at issue prior to the court action. N.C.G.S. § 8C-1, Rule 901(b)(2). *See also* 2 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 197 (3d ed. 1988) (quoting *Nicholson v. Lumber Co.*, 156 N.C. 48, 72 S.E.2d 86 (1911)). This Court has held that "[t]he competency, admissibility, and sufficiency of the evidence is a matter for the court to determine. The credibility, probative force, and weight is a matter for the jury." *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940). *See also* N.C.G.S. § 8C-1, Rule 104.

It was not error for the trial court to admit the letter if it could reasonably determine that there was sufficient evidence to support a finding that "the matter in question is what its proponent claims." N.C.G.S. § 8C-1, Rule 901. Defendant then, of course, would have been free to introduce any competent evidence relevant to the weight or credibility of Moore's testimony. *See* N.C.G.S. § 8C-1, Rule 104(e). After reviewing Moore's testimony concerning his familiarity with defendant's handwriting, we conclude that there was sufficient evidence to support the trial court's admission of the letter into evidence. Thus, we find no merit in defendant's sixth assignment of error.

III.

In his seventh and eighth assignments of error, defendant contends that the trial court erred in denying defendant's motions to dismiss the charges of robbery with a dangerous weapon, first-degree murder based on the felony murder rule and first-degree murder based on premeditation and deliberation for insufficiency of the evidence. Since the jury found defendant not guilty of first-degree murder under the felony murder rule, we find it unnecessary to address whether the trial court erred in denying his motion to dismiss that charge.

In support of his contention that there was insufficient evidence to convict him of the remaining charges, defendant relies almost exclusively on this Court's holding in *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987). In that case, the defendant was charged with the premeditated and deliberate first-degree murder of a con-

venience store manager, who was murdered in a store which the defendant and Harmon, a co-conspirator, planned to rob. Their plan was for Harmon to enter the store first in order to subdue the victim and then for the defendant to enter and take the money. When the defendant entered, he was "horror-stricken" to find the victim on the floor bleeding. There was no direct evidence of the defendant's participation in the stabbing; nor was there any evidence placing the defendant in the store at the time of the stabbing. *Id.* at 139-40, 353 S.E.2d at 368. This Court held that there was insufficient evidence to convict the defendant of first-degree murder based on premeditation and deliberation since there was no direct evidence that the defendant "himself inflicted the deadly blows *or* that he was ready and willing to help Harmon stab [the victim] to death [.]" *Id.* (Emphasis added.)

The State contends that, unlike *Reese*, the evidence in this case was sufficient to show that defendant committed both the robbery with a dangerous weapon and the murder of the victim, either individually, or under a theory of aiding and abetting or acting in concert, and that the evidence was ample to show premeditation and deliberation by defendant. We agree.

[7] In regard to the charge of robbery with a dangerous weapon the State had to prove the following elements: 1) the unlawful taking or attempt to take personal property from the person or in the presence of another; 2) by use or threatened use of a firearm or other dangerous weapon; 3) whereby the life of a person is endangered or threatened. N.C.G.S. § 14-87 (1986).

There was evidence that defendant was in possession of money apparently belonging to the victim at the time Moore and Mewborn entered the victim's home on 10 April 1990. When Mewborn inquired as to where the money was, defendant responded that he "already had it." While Mewborn was attempting to get the money from defendant, the victim appealed to his attackers to take the money and the beer and leave. There was also evidence that defendant was in possession of a gun at that time. From this evidence the jury could infer that the life of the victim was threatened by the events taking place. *See State v. Harris*, 281 N.C. 542, 189 S.E.2d 249 (1972). Thus, there was sufficient evidence to support defendant's conviction for robbery with a dangerous weapon.

[8] In regard to the charge of first-degree murder based on premeditation and deliberation, the State had to prove that defend-

ant himself either inflicted a fatal wound upon the victim or that he aided and abetted Mewborn in doing so, and that in so doing, defendant possessed the requisite *mens rea* (willfulness, premeditation and deliberation). *State v. Reese*, 319 N.C. at 142, 353 S.E.2d at 370 (citing *State v. Joyner*, 297 N.C. 349, 255 S.E.2d 390 (1979)). An unlawful killing is deliberate and premeditated if done as part of a fixed design to kill. *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 338 (1986).

The State met its burden of proof by offering evidence that defendant was present at the time Mewborn first shot the victim; that after Mewborn shot the victim with his single shot rifle, defendant said "Man, you got to kill him . . ."; that defendant complied with Mewborn's demand for more bullets by obtaining bullets from Moore after threatening him by pointing a gun in his face; that as Moore was running away from the scene he heard two more shots "a couple of seconds apart". Evidence that the defendant advocated killing the victim and then aided Mewborn in that task is sufficient for a finding that there was a "fixed design to kill" and thus that the murder was committed with premeditation and deliberation. *Id.*

This case is readily distinguishable from *Reese* because there was direct evidence in this case that defendant was present at the scene at the time of the initial assault, he advocated the killing[1], and he stood ready to support Mewborn in completing the homicide. In addition, there was circumstantial evidence to suggest that two guns were fired, thus permitting an inference that defendant himself fired one of the fatal shots at the victim. Only one cartridge case was found in the area where the victim was shot. In order for a single shot rifle to fire a subsequent bullet, the prior cartridge would have to be ejected from the gun. The victim was shot three times. In order for the three shots to come from one gun, two cartridges would have to have been ejected. Since only one ejected cartridge was found, the jury could have concluded that defendant shot one of the last two shots. From the direct and circumstantial evidence the jury could infer that de-

---

1. Testimony at trial by inmate Jerry Lynn High that defendant told him he was "surprised" when Mewborn first shot Sutton does not negate the relevance of the evidence of defendant's subsequent actions in obtaining ammunition to finish the killing nor the evidence tending to show that he fired a fatal shot or aided and abetted Mewborn in so doing.

fendant participated either directly or indirectly in the killing. Thus, the trial court did not err in denying defendant's motion to dismiss the charges.

[9] On his direct appeal, defendant finally assigns error to the trial court's refusal to charge the jury on voluntary and involuntary manslaughter. The trial court charged the jury on second-degree murder at defendant's request, but it ·was unnecessary for the jury to reach this issue since it found defendant guilty of murder in the first-degree.

Where the evidence tends to show that the defendant committed the crime charged, and there is no evidence of a lesser-included offense, the trial court is correct in not charging on the lesser-included offense. *State v. Brown*, 300 N.C. 731, 736, 268 S.E.2d 201, 204 (1980). In the present case, all of the State's evidence, if believed, tended to establish first-degree murder and not manslaughter. The defendant's evidence tended to show that he was not present at the scene of the crime, rather, that he was at Marshburn's home asleep. There was no evidence of self-defense, either perfect or imperfect. Defendant's evidence did not tend to negate any element established by the State's evidence by suggesting that defendant killed the victim but lacked malice, premeditation or deliberation. If defendant's evidence was believed, it would show that he was not guilty of any crime. Thus, we hold that it was not error for the trial court to refuse to instruct the jury on voluntary and involuntary manslaughter because there was no evidence to support these lesser-included offenses.

We further note that although the jury was instructed on the charge of second-degree murder it found defendant guilty of first-degree murder based on premeditation and deliberation. Thus, if the trial court did err by failing to instruct the jury on voluntary and involuntary manslaughter, the error was rendered harmless by the jury's verdict finding defendant guilty of premeditated and deliberate first-degree murder. *See State v. Young*, 324 N.C. 489, 492, 380 S.E.2d 94, 96 (1989); *State v. Tidwell*, 323 N.C. 668, 675, 374 S.E.2d 577, 581 (1989).

[10] Lastly, we turn to the issue of whether the trial court erred in denying defendant's motion for appropriate relief. Through the motion, defendant requested a new trial pursuant to N.C.G.S. § 15A-1415(b)(6) (1988), claiming that newly discovered evidence had been made available after his trial which had a direct and

material bearing on his innocence. The evidence was in the form of a letter, written by Mewborn and mailed to defendant's attorneys following defendant's trial, in which Mewborn stated that defendant was not present at Sutton's house when Mewborn and Jeffrey Moore killed Sutton. After holding an evidentiary hearing as ordered on remand by this Court, the trial court denied defendant's motion for a new trial.

The decision of whether to grant a new trial in a criminal case on the ground of newly discovered evidence is within the trial court's discretion and is not subject to review absent a showing of an abuse of discretion. *State v. Gappins*, 320 N.C. 64, 75, 357 S.E.2d 654, 661 (1987). Findings of fact made by the trial court are binding on appeal if they are supported by the evidence. *State v. Coker*, 325 N.C. 686, 692, 386 S.E.2d 196, 199 (1989); *State v. Stevens*, 305 N.C. 712, 719-20, 291 S.E.2d 585, 591 (1982). We conclude that the trial court's findings of fact are supported by sufficient evidence and that defendant has failed to show any abuse of discretion by the trial court.

The trial court found as facts, *inter alia*, that defendant and Mewborn were both housed in the Common Jail of Lenoir County awaiting trial for Sutton's murder. Defendant informed Mewborn that he did not want him to testify in his case since Mewborn could then face the death penalty. During the trial, defendant informed Mewborn that he in fact was being "railroaded." Defendant's attorneys interviewed Mewborn during the trial to see if he had any information which would assist defendant. Mewborn responded in the negative, although he later testified at the hearing that he knew at the time that defendant was not involved in the killing.

Pursuant to N.C.G.S. § 15A-1415(b)(6), newly discovered evidence must be "unknown or unavailable to the defendant at the time of trial" in order to justify relief. In this case, the trial court concluded that the information possessed by Mewborn "was known to the defendant, Phillip Novell Wiggins, and available to the defendant, Phillip Novell Wiggins, at the time of trial," and therefore denied defendant's motion for appropriate relief. We have reviewed the transcript of the hearing and conclude that the trial court's findings of fact are supported by the evidence. Defendant has shown no abuse of discretion by the trial court in denying defendant's

motion. We therefore find no error in the trial court's denial of defendant's motion for appropriate relief.

For all the reasons previously discussed, we conclude that defendant received a fair trial, free from prejudicial error, and that there was no error in the denial of defendant's motion for appropriate relief.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.