STATE OF NORTH CAROLINA v. DEXTER HARRIS

No. COA98-100

(Filed 15 February 2000)

### Evidence— codefendant's statement—no prejudicial error

The trial court did not commit prejudicial error by admitting inculpatory statements of an unavailable codefendant in a prosecution for first-degree murder under the felony murder rule, first-degree kidnapping, conspiracy to commit murder, and robbery with a dangerous weapon, because: (1) the evidence of defend-

ant's participation in the death of the victim, including defendant's own statements to the FBI admitting culpability in the carjacking that led to the victim's murder, was overwhelming even without admission of the codefendant's statement; (2) defendant received the minimum allowable sentence of life imprisonment without parole; and (3) the challenged statement was not introduced during the State's case-in-chief, but on rebuttal, after defendant testified that he knew nothing about the kidnapping or the victim.

On remand by order of the Supreme Court of North Carolina filed 25 June 1999 to reconsider the unanimous decision of the Court of Appeals, *State v. Harris*, 132 N.C. App. 134, 517 S.E.2d 427 (1999) (unpublished table opinion) in light of the decision of the United States Supreme Court in *Lilly v. Virginia*, 527 U.S. 116, 144 L. Ed. 2d 117 (1999). Appeal by defendant from judgment entered 26 February 1997 by Judge Quintin T. Sumner in Nash County Superior Court was originally heard in the Court of Appeals 16 November 1998. Heard on remand 3 January 2000.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

SMITH, Judge.

Defendant was convicted of first-degree murder pursuant to the felony murder rule, first-degree kidnapping, conspiracy to commit murder, and robbery with a dangerous weapon. The trial court sentenced defendant to life imprisonment for murder, 144 to 182 months for kidnapping, and 480 to 585 months for conspiracy. On appeal to this Court, the conviction and sentence were affirmed in an unpublished opinion. The North Carolina Supreme Court allowed discretionary review "for [the] limited purpose of remanding to NC Court of Appeals for reconsideration in light of *Lilly v. Virginia*." On remand to this Court, parties were ordered to file supplemental briefs addressing the *Lilly* issue—that is, whether admission of certain inculpatory statements by an unavailable co-defendant violated defendant's confrontation clause rights. We find no prejudicial error in defendant's conviction.

During defendant's trial for the robbery, kidnapping, and murder of Jodie Plew, defendant testified that, although he stole the car from

the victim, co-defendant Bobby Arrington had committed the kidnapping and murder alone without defendant's knowledge. In rebuttal, the State presented Arrington's confession to FBI agents describing his and defendant's involvement in the crimes. Arrington's statement admitted participation in the crimes, but stated that defendant fired the fatal shot that killed the victim.

After conducting a *voir dire* hearing to determine the admissibility of the statement, the trial court allowed admission of this statement under N.C. Gen. Stat. § 8C-1, Rule 801(d)(E) (1999) (statement by co-conspirator in furtherance of conspiracy). On appeal to this Court, we held that because the statement was made after Arrington was taken into custody, it necessarily could not have been made "during the course and in furtherance of the conspiracy." *Id.* However, we found the evidence admissible under N.C. Gen. Stat. § 8C-1, Rule 804(b)(3) (1999) (statements against interest), because of the highly inculpatory nature of Arrington's statement to FBI agents and because "[t]he statement gave details of the crime and the location of the body, both of which were substantially corroborated by uncontroverted evidence presented during trial."

Without reaching the issue of whether the statement against interest exception to the hearsay rule is "firmly rooted," we found sufficient indicia of reliability in the statement itself and corroborating evidence presented during the trial to conclude that there had been no violation of defendant's confrontation clause rights. Subsequent to that decision, however, the United States Supreme Court, in *Lilly*, 527 U.S. 116, 144 L. Ed. 2d 117, visited the issue of confrontation clause violations resulting from admission of statements made by unavailable co-defendants.

"In all criminal prosecutions . . . the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him.' " *Id.* at ——, 144 L. Ed. 2d at 126 (quoting U.S. Const. amend. VI). However, this right is not unqualified. Rather, when a declarant is unavailable to testify at trial, his or her hearsay statement may only be admitted if it "is sufficiently dependable to allow [its] untested admission . . . against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Id.* at ——, 144 L. Ed. 2d at 127 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 497, 608 (1980)).

In *Lilly*, the Virginia Supreme Court upheld a state trial court decision admitting, in their entirety, several tape recordings and written transcripts of a series of statements by the defendant's brother during a police interrogation. In those statements, the defendant's brother admitted being present throughout the crime spree for which both were charged, but insisted that he was drunk at the time and that the defendant was primarily responsible for the assorted crimes and violence. *See Lilly*, 527 U.S. at ——, 144 L. Ed. 2d at 124-25. The United States Supreme Court reversed, with a four justice plurality concluding that because this accomplice confession was largely "non-self inculpatory," in that the declarant minimized his own criminal responsibility and shifted blame to the defendant, it was presumptively unreliable. *See id.* at ——, 144 L. Ed. 2d at 135-36.

Additionally, the United States Supreme Court, by plurality opinion in *Lilly*, established that "statements against interest" do not fall within a "firmly rooted" hearsay exception. Therefore, to be admissible into evidence, co-conspirator's statements must contain " 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Id.* at ——, 144 L. Ed. 2d at 127. Such indicia of reliability must be present in the statement itself and not by reference to other evidence presented at trial. *See id.* at ——, 144 L. Ed. 2d at 135.

Pursuant to *Lilly*, co-defendant Arrington's statement to FBI agents is not a "firmly rooted" hearsay exception and thus must bear sufficient indicia of reliability to be admissible against defendant Harris. Even assuming *arguendo* that Arrington's statement failed to meet that standard of reliability, such error is not prejudicial.

Prejudicial error is shown " 'when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial[.]' " *State v. Wiggins*, 334 N.C. 18, 27, 431 S.E.2d 755, 760 (1993) (alteration in original) (quoting N.C. Gen. Stat. § 15A-1443(a) (1988)). Errors affecting a defendant's constitutional rights are presumed to be prejudicial. *See State v. Brown*, 306 N.C. 151, 164, 293 S.E.2d 569, 578 (1982). Therefore, the defendant will be entitled to a new trial unless the State demonstrates that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705 (1967); *Brown*, 306 N.C. 151, 293 S.E.2d 569; *see also* N.C. Gen. Stat. § 15A-1443(b).

In the case at bar, the State has successfully met this burden. Evidence of defendant's participation in the crimes that resulted in

the death of Jodie Plew was overwhelming even without admission of Arrington's statement.

The victim was driving a black Mazda 626 at the time of her disappearance, and the record of the victim's gas card showed usage from North Carolina to Florida following her disappearance. Defendant was taken into custody in Florida after the black Mazda 626 he had been driving was impounded.

Furthermore, a friend of defendant, Merl Wayne Joyner, testified for the State. Joyner stated that on the day of the victim's disappearance, Joyner and his brother met defendant and Arrington at an apartment complex in Raleigh. The four drove to a pawn shop (where defendant pawned a few items), consumed several beers, and returned to Joyner's house in Rocky Mount so that defendant could retrieve his .12 gauge sawed-off shotgun. During the time they were together, defendant informed his companions that he needed to leave Raleigh, as he felt he was about to be charged with carjacking. Defendant and Arrington discussed stealing a car so that they could leave town.

Joyner testified that during the time they were together, they rode through several parking lots, one of them being the Winn-Dixie parking lot (on Sunset Avenue) from which the victim was later abducted. Joyner dropped off defendant and Arrington around 6:30 p.m. at a Holiday Inn in the vicinity of Sunset Avenue. Defendant retrieved the weapon from the trunk of Joyner's car and wrapped it in a towel. Arrington had in his possession a pool stick. Joyner's brother also testified and corroborated Joyner's testimony.

Joyner and his brother positively identified the weapon in the State's possession as belonging to defendant. Joyner testified that at the time defendant retrieved the weapon, there were four shells in the chamber and Joyner gave defendant four more. Seven shells of similar size and type were presented to Joyner, who recognized them as those provided to defendant on the day of the victim's disappearance. Six shells were unspent; one was spent.

David C. Haseman, another friend of defendant, also testified for the State. Defendant regularly kept a duffle bag full of clothes at Haseman's home. On the night of the victim's disappearance, defendant tapped on Haseman's window and told Haseman he needed to retrieve his bag. Haseman testified that when he went to the front of the house to give defendant the bag, he saw a dark-colored Mazda

parked in front of his house. He had never before seen the vehicle, nor had he seen it since that night. Haseman asked Arrington for his pool stick, which Arrington had borrowed from him earlier that day. Defendant returned the pool stick, and defendant and Arrington hurriedly drove away.

Additionally, Jorge M. Rodriguez, an employee for Beach Towing Services in Miami Beach, Florida, testified for the State. Shortly after midnight on 1 April 1995, a black Mazda sedan with North Carolina license plates was towed from a shopping center parking lot. Rodriguez recorded the vehicle identification number and license plate number when the vehicle was towed. The numbers matched those of the victim's vehicle. At around 3:00 or 3:30 a.m., two men arrived at the towing company inquiring about the Mazda. Rodriguez identified defendant as one of the men present that morning.

John Sallie was the security officer on duty at the towing company when the two men came to inquire about the Mazda. He also identified defendant as one of the men. Sallie was called back to the tow lot the next day. Rodriguez opened the trunk of the Mazda, where he had discovered a sawed-off shotgun. Sallie identified the weapon in court. It was the same weapon previously identified as that belonging to defendant.

An FBI agent working in forensics testified regarding the search of the Mazda that was located at the tow facility. Inside the passenger side of the vehicle, he found a green shotgun shell. He also noticed bark on the front turn signal. He found a piece of paper with a name and address written on it (the same name and address of defendant's and Arrington's acquaintance in Florida) and a note addressed to "Dexter." Also within the vehicle was a court document with the name "Dexter Harris" on it, defendant's birth certificate, and several documents signed by defendant. The agent also testified to a grocery receipt found within the vehicle; the grocery store was the Winn-Dixie from which the victim purchased grocery items and listed the same items that the victim had purchased just prior to her abduction.

Another FBI agent, admitted as an expert in fingerprint identification, testified that the print found on the shotgun matched defendant's fingerprint card. Additionally, the State offered in evidence testimony of a conversation between investigators and defendant, in which defendant informed the investigators of the location of the victim's body.

Most important to our analysis here is the testimony of an FBI agent assigned to the case in Florida. The agent testified that defendant, after consulting with his attorney at some length, provided the investigators in Florida with a statement admitting his involvement in the carjacking that led to the murder of the victim. The statement provided specific facts of the events of that day, corroborating much of the testimony already presented by the State. In the statement, defendant admitted forcing the victim into the trunk of the vehicle and driving away from the Winn-Dixie parking lot to a secluded area; both defendant and Arrington exited the car and removed the victim from the trunk. Defendant then claimed to go to the front of the vehicle, leaving Arrington alone with the victim. He heard a shotgun blast and returned to the rear of the vehicle. He then stated that Arrington dragged the victim's body into the woods and covered it with leaves and branches. The two left the area and disposed of the victim's possessions behind a Kroger grocery center. Defendant proceeded to list the items the two disposed of and the items they retained. The agent testifying to this statement indicated that defendant's demeanor during the interview was "very laid back . . . very casual." Accordingly, defendant, in his statement to the FBI, admitted culpability in the very crimes for which the jury found him guilty, including first-degree murder by reason of the felony murder rule.

The evidence of defendant's participation in the crimes was staggering. "Overwhelming evidence of guilt will render even a constitutional error harmless." *State v. Welch*, 316 N.C. 578, 583, 342 S.E.2d 789, 792 (1986) (citations omitted). After conducting a thorough review of the evidence presented in this case and taking into consideration that the jury found defendant guilty of first-degree murder under the felony murder rule as opposed to premeditation and deliberation, we conclude that the jury would have reached the same verdict without admission of Arrington's hearsay statement.

Because admission of the statement did not affect the guilty verdict reached by the jury, the only prejudice defendant could have suffered would have to exist in the sentencing. When a defendant is convicted of first-degree murder under the felony murder rule, the jury may either recommend a life sentence or death. *See* N.C. Gen. Stat. § 14-17 (1999). The only difference between Arrington's statement and defendant's own statement to FBI was the identity of the triggerman. For defendant to have received the death sentence, the State was required to prove either that defendant actually pulled the trigger or that he shared in the triggerman's intent to kill. *See Enmund v.*

*Florida,* 458 U.S. 782, 73 L. Ed. 2d 1140 (1982) (holding that before a defendant may be sentenced to death, he must have killed or attempted to kill or intended or contemplated that life would be taken). Here, the jury was unable to reach a unanimous verdict regarding sentencing. Accordingly, the trial court was required to impose on defendant the minimum sentence—life imprisonment without parole. *See* N.C. Gen. Stat. § 15A-2000(b) (1999). Because defendant received the minimum allowable sentence for conviction of first-degree murder, he necessarily suffered no prejudice.

We further note that the challenged statement was not introduced during the State's case-in-chief, but on rebuttal, after defendant testified that he knew nothing about the kidnapping of the victim. "Evidence which might not otherwise be admissible against a defendant may become admissible to explain or rebut other evidence put in by the defendant himself." *State v. Small,* 301 N.C. 407, 436, 272 S.E.2d 128, 145-46 (1980) (citations omitted), *superseded by statute on other grounds as stated in State v. Holmes,* 120 N.C. App. 54, 64, 460 S.E.2d 915, 921-22 (1995).

No prejudicial error.

Chief Judge EAGLES and Judge TIMMONS-GOODSON concur.