IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-205

 Filed: 20 October 2020

Lee County, Nos. 96 CRS 1672-73

STATE OF NORTH CAROLINA

 v.

UTARIS MANDRELL REID, Defendant.

 Appeal by the State from order entered 7 December 2018 by Judge C. Winston

Gilchrist in Lee County Superior Court. Heard in the Court of Appeals 15 October

2019.

 Attorney General Joshua H. Stein, by Assistant Attorney General Mary Carla
 Babb, for the State.

 North Carolina Prisoner Legal Services, Inc., by Lauren E. Miller, for the
 defendant.

 BERGER, Judge.

 On July 24, 1997, Utaris Mandrell Reid (“Defendant”) was found guilty of first-

degree murder and common law robbery. Defendant appealed his conviction and

argued that the trial court erred when it denied his motion to suppress his confession

to murdering and robbing John Graham. In an unpublished opinion filed on October

19, 1999, this Court upheld Defendant’s conviction and determined that the trial

court did not err when it denied Defendant’s motion to suppress. State v. Reid, No.

COA98-1392, 135 N.C. App. 385, 528 S.E.2d 75 (N.C. Ct. App. Oct. 19, 1999)

(unpublished).
 STATE V. REID

 Opinion of the Court

 Defendant has since filed a series of post-conviction motions, including this

motion for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1415. On December

7, 2018, the trial court granted Defendant’s motion for appropriate relief and vacated

Defendant’s conviction on the grounds of newly discovered evidence pursuant to N.C.

Gen. Stat. § 15A-1415(c), and a violation of Defendant’s due process rights.

 The State appeals, arguing that the trial court (1) erred when it determined

that Defendant’s confession was a “purported confession;” (2) abused its discretion

when it granted Defendant a new trial; and (3) erred when it determined that

Defendant’s due process rights would be violated if he were not allowed to present

the new evidence at a new trial. We agree and reverse the decision of the trial court.

 Factual and Procedural Background

 On September 30, 1996, the trial court made the following relevant findings of

fact related to Defendant’s motion to suppress:

 1. On October 21,1995, Mr. John Graham, a 69 year old
 black male, was operating a cab for Service Cab Company.
 At approximately 7:15 p.m. on the above date, Officer Baca
 of the Sanford Police Department received a call to Humber
 Street in reference to an assault. He found Mr. Graham
 lying on his back approximately 20 feet from his vehicle.
 Mr. Graham had facial injuries that were visible to Officer
 Baca. Mr. Graham told the officer that he had been
 assaulted by young black males who had ridden in his cab.
 Due to Mr. Graham’s physical condition, the officers were
 not able to get very much information from him concerning
 the identity of the black males who had assaulted him.

 -2-
 STATE V. REID

 Opinion of the Court

2. On December 17, 1995, Mr. Graham died as a result
of complications from the injuries he sustained during the
assault on October 21, 1995. He was never physically able
to assist in identifying his attackers.

3. Detective Jim Eads of the Sanford Police
Department was assigned to investigate the October 21,
1995 attack on Mr. Graham. Detective Eads at that time
had ten (10) years of experience as a detective with the
Sanford Police Department. On December 20, 1995,
Detective Eads went to the residence of the defendant’s
grandparents in order to speak with the defendant.
Detective Eads spoke with the defendant’s grandfather and
told him he needed to speak with the defendant at the
police department for 15 to 20 minutes. The defendant then
accompanied Detective Eads to the police department.

4. Upon arrival at the police department, Detective
Eads and the defendant went to one of the interrogation
rooms in the detective division. At approximately 4:19 p.m.,
Detective Eads advised the defendant of his Miranda
Rights using State’s Exhibit 1. Detective Eads read each
right of the Miranda Warning to the defendant. After
reading each right to the defendant, Detective Eads told
the defendant to place his initials by the right indicating
he understood that right. The defendant initialed each
right. Detective Eads then read the Waiver of Rights at the
bottom of State’s Exhibit 1 to the defendant and asked the
defendant to sign at the bottom of the waiver if he
understood the waiver and wanted to talk to Detective
Eads. The defendant signed the Waiver of Rights.

5. During the rights warning, the defendant and
Detective Eads were alone. Detective Eads had no
problems communicating with the defendant. The
defendant was very attentive during the process. He did
not stutter.

6. After the rights advisement and waiver, Detective
Eads told the defendant that he was investigating the

 -3-
 STATE V. REID

 Opinion of the Court

assault on Mr. Graham. He also told the defendant that
Mr. Graham had died. The defendant told Detective Eads
“I am not going down for this by myself.” The defendant
then proceeded to tell Detective Eads about his
involvement in the assault on Mr. Graham. This took the
defendant about 15 minutes. During this time, Detective
Eads did not write down any notes. The defendant did not
stutter during this time.

7. After the defendant admitted to Detective Eads that
he had been involved in the assault and robbery of Mr.
Graham, Detective Eads contacted a detective assigned to
juvenile matters, Harold Layton. Detective Eads’ asked
Detective Layton to come to the police department to assist
in making arrangements for placing the defendant in
secure custody.

8. After calling Detective Layton, Detective Eads went
back to the defendant and spoke with him about putting
his statement in writing. The defendant told Detective
Eads he could not write very well; however, he agreed to
allow Detective Eads to write the statement for him.
Detective Eads wrote a statement based on what the
defendant had told him. This statement is State’s Exhibit
2.

9. After writing the statement, Detective Eads went
back over it with the defendant. He placed the statement
in front of the defendant and read it to the defendant word
for word as it was written. The defendant initialed the
beginning and ending of each paragraph as well as two
corrections on the second page. Detective Eads asked the
defendant to sign the bottom of each page if he agreed that
the statement was true. The defendant then signed the
bottom of each page of the statement. The statement was
signed at 6:25 p.m. on December 20, 1995.

10. After signing the statement, the defendant was
allowed to call his grandmother. She came to the police
department and was told by the officers what had

 -4-
 STATE V. REID

 Opinion of the Court

 happened. She was given an opportunity to speak with the
 defendant. The defendant’s mother also came to the police
 department and was told what happened. She also was
 given an opportunity to speak with the defendant.

 11. The defendant is a black male with a date of birth of
 July 22, 1981. At the time of this incident, he lived
 primarily with his grandparents. He was and still is
 enrolled in the Lee County School System at Bragg Street
 Academy and received the grades set out on Defendant’s
 Exhibits 1 and 2.

 12. Prior to this hearing, the defendant was tested and
 examined by Dr. Stephen Hooper of the Clinical Center for
 the study of Development and Learning at the University
 of North Carolina at Chapel Hill. Dr. Hooper is an expert
 on child neuropsychology. According to Dr. Hooper, the
 defendant has an I.Q. of 66. The defendant tested as having
 writing comprehension at the 5.2 grade level and a
 listening comprehension of the 3.5 grade level. The
 defendant can read at about the fourth grade level and
 write at about the third grade level. The defendant also
 reported to Dr. Hooper that he had used marijuana on
 December 20, 1995, but did not tell Dr. Hooper how much
 he had used. Dr. Hooper testified that the Miranda Rights
 given to the defendant were at a 4.9 grade level. The
 Waiver of Rights paragraph was at an 8.4 grade level and
 the confession signed by the defendant was at a 5.6 grade
 level. However, Dr. Hooper stated these figures were
 variable depending on how the information was conveyed
 to the listener. Dr. Hooper also stated that some 33 words
 on the confession were not understood by him and not
 factored into the calculations on the grade level of the
 confession.

 Detective Eads testified at trial and read Defendant’s confession to the jury.

Defendant’s signed confession was as follows:

 We were on Goldsboro Avenue the night the cab driver got
 beat up. It was me, Elliott McCormick, who they call L.L.,

 -5-
 STATE V. REID

 Opinion of the Court

and Anthony Reid, who they call Pop, and Duriel Shaw,
who they call Shaw Dog. Elliott McCormick called the cab
company for a ride and had the cab meet us at the new
apartments on Goldsboro Avenue that sit at the back fence
to Oakwood Avenue apartments.

 While the cab was coming, we got to planning how
we were going to rob whoever the driver was. Duriel Shaw
and Elliott McCormick were planning it out. Duriel was to
snatch the money and Elliott was going to punch him. The
older man who use to sell ice cream to us was the driver
when the cab pulled up. All of us got in the back seat of the
cab. Me, Duriel Shaw, Anthony, and Elliott McCormick.
We were going to Kendale. Elliott McCormick and Duriel
Shaw were going to stay together that night and Anthony
Reid and I were going to stay together. Anthony is my
double first cousin. Elliott is related to me also. Elliott
McCormick is related to me through my father.

 We directed the driver to the Kendale area on
Humber Street by Hallman Foundry. We had him stop
because we were going to rob him at that time. The meter
read about $4 and none of us had any money. The driver,
who we call Dad because he was so old, always drove real
slow which took more time on the meter and increased the
price. We had him stop in the roadway at the foundry and
were going to rob him in the car. Me and Duriel Shaw tried
to do so first in the car. We reached over the front where he
sat and I tried to grab under his leg where he kept some
money and Duriel Shaw was grabbing in his shirt.

 The old cab driver got to grabbing our arms and
moving around, so we stopped and we all jumped out of the
cab and started returning. We all ran to the back of
O’Connell’s Supermarket and stopped. And Anthony Reid
. . . said, ‘[expletive deleted] that, we’re about ready to go
back and rob him.’

 We walked back to the cab. The cab driver was still
in the car and sitting in the road on Humber Street and

 -6-
 STATE V. REID

 Opinion of the Court

talking on his microphone. As we approached him, he
jumped out of the cab, started cussing, saying, ‘I’m going to
kill all you all . . . [expletive deleted],’ and still walking
towards us. We began beating him and found some wood
sticks nearby and used them to hit him with also. The cab
driver fell to the ground on the pavement on the roadway.
Duriel Shaw, Anthony Reid, Elliott McCormick, and I
began going through his pockets. I found $5 in one dollar
bills in his left front shirt pocket and I took it. I don’t know
if the rest of them got any money or not, but they were
going through his pockets. We decided also, when we
walked back to the cab driver as he sat in the road, to take
his car, but we didn’t. We just left it in the road. Elliott
McCormick, Duriel Shaw, and Anthony Reid, and I all ran
away together to Windham’s Electronics and over to Crown
Cable, and then ran behind Kerr Drugs and split up
afterwards. Duriel and Elliott went to Elliott McCormick’s
house, and me and Anthony went to my house. We did not
go back over toward Dalrymple and Humber Street.

 I don’t recollect anyone taking anything from the
car, at least I know I didn’t. The next day we all got
together on Shawnee Circle at the back fence and talked
about it. We talked about how we could have killed him and
how we could have taken the cab. We all promised not to
talk about it. I tried to call Central Carolina Hospital after
we beat him, but I didn’t know his name. I think he use to
go to New Zion Baptist Church with us. I also think he was
a friend of one of my mom’s friends. My grandmother had
even told me she knew his wife. I never said anything to
anyone about it until tonight.

 I really would like to apologize for what I’ve done
and especially to an old man like him. I was never ever like
this until I got to hanging around with these other boys and
drinking and smoking marijuana. I usually drank beer and
not liquor. I had been drinking beer that night and had
drank a 22 ounce IceHouse Beer. The rest of us – the rest
had been drinking gin, Canadian Mist, white liquor and
beer. We were getting the beer and liquor from an Ann

 -7-
 STATE V. REID

 Opinion of the Court

 Budes who stays nearby where we were staying – were
 standing around at the new apartments on Goldsboro
 Avenue. We all had also been smoking marijuana in blunts
 by inserting marijuana in the cigar so the cigar would cover
 the smell.

 I’m truly sorry for what I’ve done and I tried to turn
 a bad thing around that I have done by being truthful and
 cooperative concerning this incident. I swear that all I’ve
 told Detective J.M. Eads of the Sanford Police Department
 is the truth, and it was Duriel Shaw, Elliott McCormick,
 and Anthony Reid and myself who beat the cab driver and
 that we also used sticks to do this because we intended to
 rob him and did rob him after we beat him. I have further
 allowed Detective Eads of the Sanford Police Department
 to write this statement for me in order that I may
 accurately reflect what happened that night and, again,
 how truly sorry I am for what I’ve done.

 On July 24, 1997, a Lee County jury found Defendant guilty of first-degree

murder and common law robbery. Defendant appealed, alleging the trial court erred

when it denied his motion to suppress his confession.

 In an unpublished opinion filed on October 19, 1999, this Court upheld

Defendant’s conviction and determined that the trial court did not err when it denied

Defendant’s motion to suppress. In so holding, we considered information in the

record that Defendant was a slow learner, had an overall IQ of 66, read on a third-

grade level, and other circumstances surrounding his confession. We noted that

 [w]hile a defendant’s subnormal mental capacity is a factor
 to be considered in determining whether the defendant’s
 waiver of rights is intelligent, knowing and voluntary, such
 lack of intelligence, standing alone, is insufficient to render
 a statement involuntary if the circumstances otherwise
 indicate that the statement is voluntarily and intelligently

 -8-
 STATE V. REID

 Opinion of the Court

 made. State v. Fincher, 309 N.C. 1, 305 S.E.2d 685 (1983).
 Likewise, a defendant’s young age is a factor to be
 considered, but his youth will not preclude a finding of
 voluntariness in the absence of mistreatment or coercion
 by the police. Id.

 Despite the evidence cited by defendant of his below
 average intelligence, comprehension, and verbal abilities,
 there is substantial evidence in the record to support the
 trial court’s determination. Detective Eads testified that he
 asked defendant whether he understood each right and
 whether he had any questions. Defendant responded that
 he understood and that he did not have any questions.
 Detective Eads further testified that he did not have any
 difficulty communicating with defendant, and that he did
 not have to repeat himself to make himself understood by
 defendant, who was very attentive. He also testified that
 defendant did not stutter during the interview.

 None of the witnesses presented by defendant were
 present in the interrogation room to observe defendant and
 to determine whether he actually understood his rights at
 the time. There is nothing in the record to indicate that
 Detective Eads or any police officer coerced defendant into
 giving a statement. To the contrary, Detective Eads’
 testimony indicates that defendant voluntarily gave the
 statement to not “go down for this alone.”

 Because there is ample evidence to support the
 court’s findings of fact, those findings are binding. State v.
 Rook, 304 N.C. 201, 283 S.E.2d 732 (1981), cert. denied, 455
 U.S. 1038, 72 L. Ed. 2d 155 (1982). We also find that the
 court’s findings of fact support its conclusions of law and
 its order denying the motion to suppress.

State v. Reid, No. COA98-1392, at *4-6 (N.C. Ct. App. Oct. 19, 1999) (unpublished).

 Defendant subsequently filed post-conviction motions, including this motion

for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1415(c). Specific to this

 -9-
 STATE V. REID

 Opinion of the Court

motion, Defendant alleged that William McCormick (“McCormick”) had provided

newly discovered evidence in an affidavit dated June 14, 2011. McCormick’s affidavit

contained the following assertions:

 3. In 1995, I was sixteen years old, and I lived with my
 mother and brother Elliott McCormick at 417 Judd St. in
 Sanford, NC.

 4. At the time, my mother worked the night shift and
 was also a minister.

 5. Utaris Reid often visited my home and spent time
 with my brother and me.

 6. Utaris Reid was younger than me, and he lived
 about four houses away on Shawnee Circle.

 7. Utaris came to our house often because his mother
 and her boyfriend were drug-addicts, and he often had to
 provide for himself.

 8. Utaris would visit with his grandmother who lived
 out in the country. She cared for Utaris and bought him
 clothes and necessities.

 9. Utaris was in special education classes in school,
 and he was slow.

 10. My brother Elliott and I would often use taxi cabs to
 go to and from our home at night.

 11. I knew cab driver John Graham by the nickname
 “Pop.”

 12. On the night that Mr. Graham was assaulted, I
 remember staying at home.

 - 10 -
 STATE V. REID

 Opinion of the Court

13. My mother, a minister, anointed my head and my
brother Elliott’s head with oil, and she was moving about
the house speaking in tongues. She said that she had a
feeling that something bad was going to happen that night,
so she stayed home from work. She made my brother and I
stay home even though we wanted to go out.

14. At the time, my brother Elliott and I were involved
in selling crack cocaine on the street near the Goldsboro
apartments.

15. Since we were not allowed to leave the house that
night, our friends came to the house to get drugs.

16. Robert Shaw, Norman Cox, and T. Bristow came to
the house, and they were sweating and out of breath. I
learned from Shaw that they had left a cab without paying
the fare and ran to the house.

17. My mother made my friends leave the house that
night, and they did.

18. The next day, I had a conversation with Robert
Shaw. He told me that when he, Norman Cox, and T.
Bristow left my house, they got a cab to take them across
town. John Graham, or “Pop,” was the cab driver.

19. Shaw told me that he told Pop that they did not have
enough money to pay the fare. Pop stopped the cab near the
foundry and told the boys to get out. Shaw was in the front
passenger seat, and Cox and Bristow were in the back seat.
Cox and Bristow got out of the cab. As Shaw was getting
out of the cab, Shaw grabbed Pop’s money bag. Pop grabbed
Shaw’s gold necklace, broke it, and pulled it off Shaw. Shaw
began to punch and hit Pop, trying to get his necklace back.
Cox and Bristow joined Shaw beating, kicking, and
stomping Pop. Shaw got his necklace away from Pop and
the three boys ran. There was only $5 in the money bag.

 - 11 -
 STATE V. REID

 Opinion of the Court

 20. After Pop died, the police came to my house because
 they were looking for teenage boys who used cabs with
 Judd Street destinations.

 21. The police picked up my brother Elliott and Utaris
 Reid and took them to the police station.

 22. My brother Elliott told me that he was placed in an
 individual room. He said that the police were yelling and
 throwing chairs around in the room trying to get him to
 confess to murder. They asked him to sign a paper, but
 Elliot[t] refused to sign.

 23. Elliot[t] has since passed away.

 24. I was not interviewed by the police or any attorneys
 involved in Utaris Reid’s case.

 25. After Utaris Reid was convicted and sentenced, I felt
 bad because I knew that he did not commit the murder.

 26. I went to the Sanford Police Department and spoke
 to Detective Freeman Worthy. I told Detective Worthy that
 Utaris Reid did not commit the crime he was convicted of.
 I told him that Shaw, Cox, and Bristow committed the
 crime.

 27. In 2005, I saw Detective Worthy at the Piggly Wiggly
 supermarket. I told him again that they convicted the
 wrong man, and I told him that Shaw, Cox, and Bristow
 committed the crime.

(Emphasis added).

 At the hearing on the motion for appropriate relief, McCormick testified over

the State’s objection that Defendant was “slow.” McCormick also testified that he

and Defendant were friends when they were younger and “smoked weed together.”

 - 12 -
 STATE V. REID

 Opinion of the Court

 McCormick testified, contrary to his affidavit, that on the night John Graham

was murdered, “[m]y mom worked the graveyard, and this particular night, my mom

was working graveyard.” According to McCormick, the graveyard shift was from

11:00 p.m. to 7:00 a.m. McCormick and his brother, Elliott, had planned to go across

town that night to sell drugs, but their mother made them stay home. According to

McCormick, he and Elliott invited Robert Shaw (“Shaw”), Antonio Bristow

(“Bristow”), and Norman Cox (“Cox”) over to their mother’s house. McCormick then

testified to the subsequent series of events:

 When they finally got there and the doorbell rang, my mom
 was like, who is at the door? She said, I told y’all, y’all not
 going nowhere tonight. We went to the door. [ ] Shaw, [ ]
 Bristow, [ ] Cox, and you know, they was – you know, we
 looked outside. The cab wasn’t there, but they was there,
 and then they was sweating and, you know, out of breath,
 running from wherever they came from[.]

 ...

 [Shaw] told us that they had just jumped out of the cab.
 They jumped out of the cab because they didn’t have no
 money, so they jumped out of the cab.

 According to McCormick, Shaw, Bristow, and Cox were at his mother’s house

for no more than 10 minutes before his mother ran them off.

 When asked if Shaw told him anything else the night Graham was murdered,

McCormick replied

 That night? Not that night. It was already wee hours of the
 morning. It was already late night anyway, so, but they,
 you know, because my mama ran us off, the next day they

 - 13 -
 STATE V. REID

 Opinion of the Court

 told me what – they told my brother and I what they had
 done. They assaulted Mr. Johnny Graham.

(Emphasis added).

 McCormick testified that Shaw told him that he, Norman, Bristow and Cox

killed Graham before they arrived at the McCormick house. Specifically, according

to McCormick, Shaw told him that:

 Well, he told how he called a cab in the middle – well, when
 he called the cab, he told them where he was coming, you
 know, to [Judd] Street, you know, which is our address, and
 said when they got by around the Hallman Foundry, they
 just told him, they said, Pop, you know, we only got five
 dollars. He was like, that’s all y’all got? And Pop, you had
 to know him. Pop, he is an old guy. Cab driver. He talked
 junk, you know. We talked junk to him. You know. And he
 said – he told, said, Pop, we only got five dollars. He said,
 look, y’all get y’all book, and he used profane language, told
 them to get out of his cab, you know, if that’s all you got,
 you know. And [Shaw] was sitting in the front seat. [Shaw]
 told me once he went to jump out the cab, he grabbed the
 money bag. And Mr. Pop had a money bag. He grabbed the
 money bag. Pop still had his seatbelt on. He reached and
 grabbed [ ] Shaw by the back of the shirt, and when he
 grabbed the back of his shirt, he grabbed his necklace. And
 when [ ] Shaw jumped out of the car, he kept his necklace
 in his hand. So [ ] Shaw wanted to get his necklace back, so
 [ ] Shaw told me Pop was trying to call in dispatch with the
 CB thing they had in the car at the time. That’s when they
 commenced to beating on him, trying to get his necklace
 back. And they beat the man, and they told me they beat
 him and they stomped him, but at the time, they didn’t
 know they did, you know.

 ...

 Once they beat him and stomped him, and [ ] Shaw’s
 necklace was broke, and Mr. Johnny still had it in his own

 - 14 -
 STATE V. REID

 Opinion of the Court

 hand. They had to end up prying it out of his hand to get
 the necklace out. You know. He held on tight to it. And they
 ran to our house as soon as they did. That’s why, when they
 came to the door, they was sweating and out of breath.

 Elliott was arrested along with Defendant for Graham’s murder and spent 19

months in custody awaiting trial before the charges against him were dismissed.

According to McCormick, he did not inform law enforcement about Shaw’s purported

confession because he lived by a street code, and Elliott told him not to say anything

because the police had no evidence.

 McCormick was also permitted to testify, over the State’s objection, about

alleged police interrogation “tactics,” and that Defendant did not read his confession

before he signed it. There was no evidence provided that McCormick was in the

interrogation room when Defendant confessed. However, McCormick did testify that

he was in court during Defendant’s trial. After Defendant was convicted, but

sometime “before 2005,” McCormick purportedly told a detective that Defendant did

not kill Graham.

 On December 7, 2018, the trial court granted Defendant’s motion for

appropriate relief and vacated Defendant’s conviction on the grounds of newly

discovered evidence pursuant to N.C. Gen. Stat. § 15A-1415(c), and a violation of

Defendant’s due process rights. The trial court made the following relevant findings

of fact:

 1. . . . The principal State’s evidence against Defendant
 was a statement taken from Defendant by the lead

 - 15 -
 STATE V. REID

 Opinion of the Court

detective. Defendant was 14 years old and had a combined
IQ of 66 when he signed the statement. No eyewitnesses
testified against Defendant at trial. . . .

2. At trial, Defendant challenged the credibility of the
written statement and offered an alibi defense. Trial
counsel hired an investigator for the specific purpose of
interviewing the McCormick brothers, William and Elliott,
potential witnesses in the case, but was unable to interview
them by the time of Defendant’s trial. In 2011, Defendant’s
MAR investigator located William McCormick, and he was
interviewed by the defense for the first time. Mr.
McCormick testified at the MAR hearing that another
teenager confessed to the assault and robbery the day after
it occurred. The teenager was with two others, who were
not Defendant. Trial counsel would have offered this
evidence if it was available at the time of Defendant’s trial
because it would exculpate Defendant and bolster his alibi
defense.

...

7. Defendant filed a motion to suppress his written
statement, and a hearing was held during the August 29,
1996 session of Lee County Criminal Superior Court before
the Honorable Wiley F. Bowen. Judge Bowen denied the
motion to suppress. On appeal, the denial of the motion to
suppress was upheld. For purposes of the MAR, the
Defendant’s statement has been treated as properly
admitted into evidence, with its weight and credibility for
the jury.

8. The case was heard for trial at the October 1, 1996
session of Lee County Criminal Superior Court before
Judge Bowen. A mistrial was declared because of a hung
jury.

9. The case came on for trial again at the July 21, 1997
session of Lee County Criminal Superior Court before the
Honorable Henry E. Frye.

 - 16 -
 STATE V. REID

 Opinion of the Court

10. On July 24, 1997, the jury found the defendant
guilty of first degree murder based on the felony murder
rule during the commission of a common law robbery.

11. Defendant was sentenced to a mandatory
punishment of life imprisonment without parole. The court
arrested judgment on the conviction for common law
robbery.

...

14. The victim in the case, John Graham, worked as a
cab driver on the date of offense, October 21, 1995. During
his shift, he radioed for help. Other cab drivers and
paramedics responded to his location within minutes,
around 7:19 p.m.

15. Officers responded to the scene of the assault. The
victim’s cab was not secured, the police did not collect any
physical evidence, and there were no eyewitnesses. There
were no fingerprints, blood evidence, or any weapon.

16. The victim was unable to respond to paramedics
except for opening his eyes in response to his name. He
suffered an apparent head injury from an assault or fall.
His visible injuries were mostly minor puncture wounds,
lacerations and abrasions around his left eye. Medical
examination revealed a 3 centimeter by 3 centimeter
hemorrhage to the right side of the victim’s brain which,
according to medical testimony at trial, could have been
caused by Mr. Graham falling and hitting his head.

17. The victim was interviewed in the emergency room
by police. The lead detective, James Eads of the Sanford
Police Department, testified that the victim told police that
two black males age 16 to 19 years old were responsible for
the assault. During cross-examination at the first trial,
Detective Eads testified that the victim gave the
information to police and he recorded the information in

 - 17 -
 STATE V. REID

 Opinion of the Court

his report. He also testified at the first trial that the victim
told police that he had picked up the two black males before
and that they had not taken anything from him on the
night of the assault.

18. At the second trial, Eads changed his testimony and
testified that the victim was unable to communicate
verbally with him at all in the emergency room. Eads was
cross-examined by Attorney Webb with his testimony from
the first trial.

...

21. On December 20, 1995, James Eads, the same
detective who interviewed the victim, went to Defendant’s
grandfather’s house and picked up Defendant at about 4:15
p.m. to take him to the police station to interview him. The
detective told Defendant’s grandfather that he would bring
him back in 15-20 minutes. Defendant’s grandfather was
elderly and the detective could not tell whether the
grandfather was drinking.

22. Defendant was 14 years old and did not have a
parent or guardian present when he was interviewed.

23. The Sanford Police Department had two juvenile
detectives on their staff at the time. They would have left
the police station at 4:00 p.m. when their shifts ended.
Detective Eads did not use a juvenile detective when he
interviewed Defendant. Detective Eads shift started at
8:00 a.m., but he waited until after the juvenile detectives
left to pick up Defendant and interview him.

24. Juvenile detectives were available for the interview
as they were on call twenty-four hours.

25. Detective Eads conducted the interview with
Defendant in an interview room that was approximately 8
feet by 10 feet with a table and chairs and no windows.

 - 18 -
 STATE V. REID

 Opinion of the Court

26. Detective Eads did not record the interview with
Defendant. He said that he was not certified in the
operation of any tape recording equipment so he could not
use it.

27. Detective Eads testified that Defendant talked or
“rambled” uninterrupted for thirty minutes without having
to be prompted with questions to continue talking.

28. Detective Eads wrote the statement that Defendant
signed. The detective acknowledged that some of his own
writing was difficult to read and he read the statement
back to Defendant.

29. Detective Eads testified that he would have treated
Defendant differently if he knew he had trouble
comprehending, but he treated him as an ordinary 14-year-
old.

30. Attorney Webb hired Dr. Steven Hooper, a child and
adolescent neuropsychologist at the Child Development
Institute at the University of North Carolina at Chapel
Hill, as an expert witness. Dr. Hooper determined that
Defendant had a full scale IQ of 66, which was in the first
or second percentile for 14-year-olds. Dr. Hooper testified
that the test was reliable and Defendant was trying hard.

31. Defendant’s overall functioning was at a fourth-
grade level. His writing was at a mid-third grade level and
Defendant had disproportionately low deficits in visual
attention and expressive language.

32. Dr. Hooper did a readability analysis to determine
the grade level of the Miranda warnings given to
Defendant and the waiver of rights form. The Miranda
warnings were at a fifth grade level and the waiver of
rights form was at a mid-eighth grade level.

33. Dr. Hooper conservatively estimated the written
statement was at a mid-fifth grade level. There were thirty-

 - 19 -
 STATE V. REID

 Opinion of the Court

three words he could not read so he did not include those.
Had they been included, the grade level would likely have
been higher.

34. Dr. Hooper opined that it was highly unlikely
Defendant understood the Miranda rights or the waiver of
rights form. He also opined that he did not think Defendant
understood the written statement. Defendant’s listening
comprehension was his lowest area, at a mid-third grade
level and his overall reading, decoding, and sight words
were a 5.2 grade level.

35. According to the written statement, signed by
Defendant, there were four young males involved in the
victim’s assault: Duriel Shaw, Anthony Reid, Elliott
McCormick, and Defendant. This was a significant
difference from the information alleged to have been
provided by the victim in the emergency room immediately
following the assault, in which he was said to have
informed police he was attacked by two black males, 16-19
years old. According to the alleged statement of Defendant,
the youths were riding in a cab driven by the victim and
tried to reach into his shirt pocket and under his leg for
money. When the victim resisted, the youths began to run
away, but then returned. The victim got out of his car and
walked towards the youths, saying that he would “kill you”.
Some of the youths then hit the victim, using wood sticks
they picked up nearby. The victim fell on the pavement,
where money was taken from his pocket.

...

37. John Love, a co-worker and good friend of the victim,
testified at the second trial, but did not testify at the first
trial. Love heard the victim call for help over the radio and
went to the scene. He testified that he asked the victim who
did this and the victim replied with three words or names,
L.L., McCormick, and Reid. Love did not remember the
order in which the victim said the names. However, Love
did not provide this information to [ ] Detective Eads when

 - 20 -
 STATE V. REID

 Opinion of the Court

he met with him shortly after the incident. Love said he did
not “put together what he was talking about until later.”
Love did not know whether the victim was just mumbling.
Love did not claim the victim specified who “Reid” was,
whether the Defendant or Anthony Reid.

...

48. At the evidentiary hearings, Defendant produced
evidence through the testimony of William McCormick
(“Mr. McCormick”) and Attorney Fred Webb, additional
documentary exhibits, and the transcripts of both trials
and the hearing on Defendant’s motion to suppress. The
Court listened to the testimony and observed the demeanor
of these witnesses, and finds that each gave credible and
truthful testimony on every issue that was material to the
findings of fact and conclusions of law which are necessary
to reach a ruling on the issues raised in the instant matter.
William McCormick was emotional during his testimony.
His demeanor gave convincing force to his testimony.

49. Mr. McCormick was located by Defendant’s
investigator in 2011. He swore to an affidavit that was
submitted as an exhibit to the MAR.

...

55. On the night that the victim was assaulted, Mr.
McCormick and his brother, Elliott, were not allowed to
leave their house on Judd Street. William McCormick
expected three other juveniles, Robert Shaw, Antonio “T”
Bristow, and Norman Cox to come to the McCormick house
that night by cab. Robert Shaw, T Bristow and Norman Cox
showed up on the doorstep but there was no cab outside.
Defendant was not with them and was never mentioned at
any time. Shaw, Bristow and Cox were sweating and out of
breath from running. Robert Shaw said they jumped out of
the cab because they did not have any money. The evidence
indicated Shaw had jumped out of the cab only a short time

 - 21 -
 STATE V. REID

 Opinion of the Court

before this statement. Mr. McCormick’s mother made Shaw,
Bristow, and Cox leave.

56. The next day, Robert Shaw told Mr. McCormick that
he, Antonio Bristow, and Norman Cox assaulted the victim
John Graham. Shaw said that he took the victim’s money
bag and when he tried to jump out of the cab the victim
grabbed Shaw’s necklace, which broke. Shaw explained
that they beat the victim to get the necklace back. Shaw
did not say that Defendant was involved. Robert Shaw, T
Bristow, and Norman Cox were not the juveniles named in
the written statement introduced at Defendant’s trial.
Shaw told William McCormick that Shaw, Bristow and Cox
ran to McCormick’s house “as soon as they did” the robbery.
The victim was in fact assaulted near the Hallman
Foundry, located no more than a mile from William
McCormick’s house.

...

58. When he was 16 years old, Mr. McCormick sold
drugs and lived a different life than when he testified
before this Court. When he was a teenager, he did not get
along with police and did not talk to the police because he
followed a “street code.” Before Defendant’s trial, Mr.
McCormick did not tell police the information that he
testified to at the MAR hearing. He explained that the
street code meant not to talk to police or help them do their
job. Mr. McCormick explained that he no longer followed a
street code and he decided to turn his life around after his
brother was murdered in 2000.

59. This Court finds Mr. McCormick’s testimony to be
credible. The court finds that McCormick in fact has no
motive to testify for Defendant other than to disclose the
true facts known to him.

60. Attorney Webb represented Defendant at both trials
and the direct appeal of his case. Attorney Webb had a
degree and training in special education and was

 - 22 -
 STATE V. REID

 Opinion of the Court

experienced working with adolescents. Defendant was 14
years old when Attorney Webb was appointed to his case
and 16 years old when he was convicted. Attorney Webb
recognized that Defendant was slow and had difficulty
communicating.

61. Attorney Webb filed a motion to suppress the
written statement and retained Dr. Steven Hooper.
Following a hearing, the motion to suppress was denied.

62. Attorney Webb challenged the credibility of the
police investigation and the written statement and raised
an alibi defense at trial.

63. Before trial, Attorney Webb spoke to contacts “in the
street” who had provided information that led him to
believe Defendant was not involved in the crime. The
names of the McCormick brothers, William and Elliott,
came up as witnesses who had information that could be
helpful to the defense. Attorney Webb moved for and
secured funds to retain Investigator Mel Palmer for the
specific purpose of locating and interviewing William
McCormick. In the motions and orders for investigator
funding, Attorney Webb specified that he was trying to
locate William McCormick.

64. Investigator Palmer attempted to interview William
McCormick, but was unable to locate him. Investigator
Palmer made attempts to serve William McCormick with a
subpoena but was unable to do so. McCormick’s mother
interfered with the investigator’s efforts to locate William
and would not allow him to be interviewed.

65. Attorney Webb was contacted by Defendant’s
counsel during the post-conviction investigation of
Defendant’s case. Attorney Webb reviewed the affidavit of
William McCormick. Had Attorney Webb been able to
locate and interview William McCormick at the time of
trial, Attorney Webb would have called him to testify to the
information contained in the affidavit.

 - 23 -
 STATE V. REID

 Opinion of the Court

 66. Attorney Webb would have presented William
 McCormick’s testimony because he found that it would
 have exculpated Defendant and bolstered Defendant’s alibi
 defense.

 67. William McCormick’s testimony was evidence that
 went to Defendant’s guilt or innocence, since it provided
 the identity of the actual perpetrators and tended to
 exonerate Defendant.

(Emphasis added).

 The trial court then made the following relevant conclusions of law:

 2. Defendant properly raised his newly discovered
 evidence claim pursuant to N.C. Gen. Stat. § 15A-1415(c).

 3. Defendant Reid met his burden of proving the
 necessary facts by a preponderance of the evidence. N.C.
 Gen. Stat. § 15A-1420(c)(5).

 4. William McCormick’s testimony is newly discovered
 evidence as defined by law. The details of his testimony
 were unknown to Defendant at the time of trial, and
 William McCormick was unavailable to Defendant at that
 time. Defendant could not have discovered or made
 available the new evidence from McCormick with due
 diligence. The new evidence has a direct and material
 bearing upon the Defendant’s guilt or innocence.
 Defendant’s motion was filed within a reasonable time of
 the discovery of the new evidence.

 5. The newly discovered evidence is probably true.

 6. The newly discovered evidence is competent, material
 and relevant. It identifies the actual perpetrators of the
 offense and exculpates the Defendant.

 7. Evidence of William McCormick’s personal
 observations of Robert Shaw, Antonio “T” Bristow and

 - 24 -
 STATE V. REID

 Opinion of the Court

Norman Cox on the night of the offense, including that
these three individuals were together, were sweating and
out of breath, that neither a cab nor the Defendant were
present, are admissible at trial.

8. Testimony from William McCormick regarding
statements made by Robert Shaw that he, Bristow and Cox
jumped out of a cab and ran because they did not have any
money are admissible as an excited utterance under North
Carolina Rule of Evidence 803(2). Shaw was under the
stress of a startling or unusual event at the time this
statement was made, sufficient to suspend reflective
thought, and causing a spontaneous reaction not resulting
from fabrication.

9. After careful scrutiny, the court concludes that the
testimony of William McCormick about Robert Shaw’s
statement regarding the details of Shaw, Bristow and Cox
assaulting the victim is admissible evidence under Rule
803(24). First, the State is on notice that Defendant would
offer such evidence at trial. Second, this hearsay evidence is
not specifically covered by any other exception in Rule 803.
Third, the evidence possesses circumstantial guarantees of
trustworthiness equivalent to other hearsay exceptions
because it constitutes an admission of criminal conduct by
Shaw, is consistent with events actually observed by
William McCormick the day before, when Shaw and the
other youths arrived at McCormick’s house out of breath
having jumped and run from a cab, and is consistent with
known circumstances of the case, including that the victim
was assaulted by more than one young male person. Fourth,
the evidence is material to the case. Fifth, the evidence is
more probative on the issue of whether Shaw, Bristow and
Cox, rather than Defendant, were the actual perpetrators of
these crimes than any other evidence procurable by
reasonable efforts. Defendant cannot reasonably be expected
to procure the in-court confession of Shaw that Shaw
himself is guilty of robbery and first degree murder. Sixth,
admission of the evidence of Shaw’s statements will best

 - 25 -
 STATE V. REID

 Opinion of the Court

serve the purposes of the Rules of Evidence and the interests
of justice. State v. Smith, 315 N.C. 76 (1985).

10. In addition to those circumstantial guarantees of
truthfulness set forth above, Shaw’s statements regarding
the murder of the victim have the following circumstantial
guarantees of truthfulness: (1) Shaw had personal
knowledge of the events described; (2) Shaw had a strong
motivation to confide the truth to his friend William
McCormick and no reason to claim false responsibility for
such serious acts which could expose him to criminal
liability; and (3) there is no evidence that Shaw ever
recanted his statement.

11. The evidence before the court does not support
conclusions as to the availability or unavailability of the
declarant Shaw for trial. Given the passage of more than
twenty years in silence, Shaw’s cooperation and
availability for trial may well be doubted, but his
unavailability cannot be assumed. If Shaw is unavailable,
his statements to McCormick would be admissible in any
case as statements against penal interest under Rule
804(b). However, taking Shaw’s unavailability not to have
been established, as the court must do given the Record
before it, his statements to McCormick are still admissible
under Rule 803(24) for the reasons set forth above.

12. Given the emotional impact and persuasive effect of
William McCormick’s testimony and the circumstantial
indications of the truthfulness of Shaw’s statements, it
would be a manifest injustice to deny Defendant the
opportunity to introduce McCormick’s evidence regarding
the statements of Robert Shaw that it was Shaw, Antonio
Bristow and Norman Cox who killed the victim in this case.
Admission of Shaw’s statements under Rule 803(24) will
best serve the interests of justice. It is consistent with the
general purposes of the Rules of Evidence.

 - 26 -
 STATE V. REID

 Opinion of the Court

 13. Defendant used due diligence and proper means to
 procure the testimony of William McCormick at
 Defendant’s original trial.

 14. The newly discovered evidence is not merely
 cumulative.

 15. The newly discovered evidence does not tend only to
 contradict, impeach or discredit a former witness.

 16. The newly discovered evidence is of such a nature as
 to show that on another trial a different result will
 probably be reached and that the right will prevail. This
 was an extremely close case, tried once to a hung jury,
 finally resulting in a conviction based largely on the
 purported confession of the fourteen year old, mentally
 disabled Defendant. No physical evidence connected
 Defendant to the case, and alibi evidence was offered. The
 addition of credible testimony from William McCormick
 will probably result in a different outcome than that
 reached in the original trial.

 17. The testimony of William McCormick points directly
 to the guilt of specific persons and is inconsistent with
 Defendant’s guilt.

 18. In addition, as an independent grounds for decision,
 denying Defendant the opportunity to present all of the
 newly discovered evidence to a trier of fact would, under
 the circumstances of this case, violate Defendant’s federal
 and state constitutional rights to due process of law.

(Emphasis added).

 Based upon these findings of fact and conclusions of law, the trial court vacated

Defendant’s conviction and ordered a new trial.

 The State appeals, arguing that the trial court (1) erred when it determined

that Defendant’s confession was a “purported confession;” (2) abused its discretion

 - 27 -
 STATE V. REID

 Opinion of the Court

when it granted Defendant a new trial; and (3) erred when it determined that

Defendant’s due process rights would be violated if he were not allowed to present

the new evidence at a new trial. At oral arguments before this Court, Defendant’s

attorney stated that Defendant was innocent of the crimes charged, but

acknowledged that Defendant had not filed an affidavit of innocence in this or any

other court.

 We reverse the decision of the trial court.

 Standard of Review

 “When considering rulings on motions for appropriate relief, we review the

trial court’s order to determine whether the findings of fact are supported by evidence,

whether the findings of fact support the conclusions of law, and whether the

conclusions of law support the order entered by the trial court.” State v. Frogge, 359

N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (citation and quotation marks omitted).

 “Findings of fact made by the trial court pursuant to hearings on motions for

appropriate relief are binding on appeal if they are supported by competent evidence.”

State v. Morganherring, 350 N.C. 701, 714, 517 S.E.2d 622, 630 (1999) (citation and

quotation marks omitted). A “trial court’s conclusions [of law] are fully reviewable on

appeal.” State v. Lutz, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35 (2006) (citation and

quotation marks omitted).

 - 28 -
 STATE V. REID

 Opinion of the Court

 A trial court’s findings of fact “may be disturbed only upon a showing of

manifest abuse of discretion.” Id. at 142, 628 S.E.2d at 35 (citation and quotation

marks omitted). “Abuse of discretion results where the court’s ruling is manifestly

unsupported by reason or is so arbitrary that it could not have been the result of a

reasoned decision.” State v. Elliott, 360 N.C. 400, 419, 628 S.E.2d 735, 748 (2006)

(citation and quotations omitted).

 Analysis

 On appeal, the State argues that the trial court (1) erred when it determined

that Defendant’s confession was a “purported confession;” (2) abused its discretion

when it granted Defendant a new trial; and (3) erred when it determined that

Defendant’s due process rights would be violated if he were not allowed to present

the new evidence at a new trial. We agree.

 A defendant may file a motion for appropriate relief at any time following a

verdict on

 the ground that evidence is available which was unknown
 or unavailable to the defendant at the time of trial, which
 could not with due diligence have been discovered or made
 available at that time, including recanted testimony, and
 which has a direct and material bearing upon the
 defendant’s eligibility for the death penalty or the
 defendant’s guilt or innocence.

N.C. Gen. Stat. § 15A-1415(c) (2019). The defendant “has the burden of proving by a

preponderance of the evidence every fact essential to support the motion.” N.C. Gen.

Stat. § 15A-1420(c)(5) (2019).

 - 29 -
 STATE V. REID

 Opinion of the Court

I. Determination that Defendant’s Confession was a “Purported Confession”

 The State first argues the trial court erred when it determined that

Defendant’s confession to the murder of Graham was a “purported confession.”

Specifically, the State argues that the trial court abused its discretion because the

trial court was bound by this Court’s prior decision regarding the validity of

Defendant’s confession. However, because we reverse the trial court for the reasons

stated below, we decline to address this argument.

II. Newly Discovered Evidence

 The State next contends that the trial court abused its discretion when it

granted Defendant a new trial. Specifically, the States argues that Defendant failed

to prove the purported newly discovered evidence by a preponderance of the evidence.

We agree.

 In order for a new trial to be granted on the ground
 of newly discovered evidence, it must appear by affidavit
 that (1) the witness or witnesses will give newly discovered
 evidence; (2) the newly discovered evidence is probably
 true; (3) the evidence is material, competent and relevant;
 (4) due diligence was used and proper means were
 employed to procure the testimony at trial; (5) the newly
 discovered evidence is not merely cumulative or
 corroborative; (6) the new evidence does not merely tend to
 contradict, impeach or discredit the testimony of a former
 witness; and (7) the evidence is of such a nature that a
 different result will probably be reached at a new trial.

 - 30 -
 STATE V. REID

 Opinion of the Court

State v. Beaver, 291 N.C. 137, 143, 229 S.E.2d 179, 183 (1976). It is the defendant’s

burden to “prov[e] by a preponderance of the evidence every fact essential to support

the motion.” N.C. Gen. Stat. § 15A-1420(c)(5).

 [A] new trial for newly discovered evidence should
 be granted with the utmost caution and only in a clear case,
 lest the courts should thereby encourage negligence or
 minister to the litigious passions of men. The defendant
 has the laboring oar to rebut the presumption that the
 verdict is correct and that he has not exercised due
 diligence in preparing for trial. Under the rule as codified,
 the defendant has the burden of proving that the new
 evidence could not with due diligence have been discovered
 or made available at the time of trial.

State v. Rhodes, 366 N.C. 532, 536-37, 743 S.E.2d 37, 40 (2013) (purgandum). We

address the pertinent factors below.

A. Probably True

 The trial court determined in conclusion of law 5 that the purported “newly

discovered evidence was probably true” and that McCormick was a credible witness.

While “[t]he trial court is in the best position to judge the credibility of a witness,”

State v. Garner, 136 N.C. App. 1, 14, 523 S.E.2d 689, 698 (1999), McCormick’s

testimony was internally inconsistent and contrary to his sworn affidavit. Although

the trial court found McCormick’s testimony credible, it is so contrary to the

information contained in his affidavit that we cannot conclude that the information

is probably true.

 - 31 -
 STATE V. REID

 Opinion of the Court

 McCormick’s sworn affidavit, which was admitted into evidence at the MAR

hearing, contradicted his testimony at the hearing. McCormick’s affidavit states that

Shaw, Cox, and Bristow came to McCormick’s house sweating and out of breath

because they fled from a cab without paying the fare. Just two paragraphs later,

McCormick’s affidavit states that Shaw told McCormick they robbed and murdered

Graham after they left McCormick’s home that night.

 At the hearing, McCormick testified that when Shaw, Cox, and Bristow arrived

at his home, they were sweating and out of breath from “running from wherever they

came from.” Shaw, Cox, and Bristow allegedly ran from the murder scene “to [the

McCormick’s] house as soon as they did [the murder].” In addition, McCormick stated

that Shaw told him they had jumped from the cab without paying the fare. But no

explanation was provided concerning why Shaw, Cox, and Bristow did not pay

Graham when Elliott had agreed to pay the fare.

 Moreover, McCormick testified that his mother “was working graveyard

[shift]” from 11:00 p.m. until 7:00 a.m., and that he remembered telling her to go to

work that night because they were waiting for her to leave to then sell drugs.

However, his affidavit indicates that his mother “stayed home from work” that

evening.

 When asked how long Shaw, Cox, and Bristow stayed at his house that night,

McCormick responded, “[m]aybe five, ten minutes. My momma ran them off.”

 - 32 -
 STATE V. REID

 Opinion of the Court

McCormick then testified that Shaw did not tell him anything about Graham’s

murder that night because “[i]t was already the wee hours of the morning.” However,

finding of fact number 13 states that paramedics responded to the scene of Graham’s

murder at 7:19 p.m. According to McCormick’s testimony, Shaw, Cox, and Bristow

fled from Graham’s cab to his home. The three were then at McCormick’s home for

at most ten minutes before his mother ran them off in “the wee hours of the morning.”

However, if McCormick’s mother was working the graveyard shift as he testified, she

could not have been home in “the wee hours of the morning” to run Shaw, Cox, and

Bristow off. Accordingly, not only is McCormick’s testimony probably not true, but it

is entirely impossible to reconcile the discrepancies in the information provided by

McCormick.

 In light of McCormick’s conflicting affidavit and inconsistent testimony,

Defendant failed to demonstrate by a preponderance of the evidence that the

information provided by McCormick is probably true.

B. Evidence in Existence at the Time of Trial and Due Diligence

 “Newly discovered evidence is evidence which was in existence but not known

to a party at the time of trial.” State v. Nickerson, 320 N.C. 603, 609, 359 S.E.2d 760,

763 (1987). “Pursuant to N.C.G.S. § 15A–1415[(c)], newly discovered evidence must

be unknown or unavailable to the defendant at the time of trial in order to justify

relief.” State v. Wiggins, 334 N.C. 18, 38, 431 S.E.2d 755, 767 (1993) (citation and

 - 33 -
 STATE V. REID

 Opinion of the Court

quotation marks omitted). Thus, where “the purported newly discovered evidence

was known or available to the defendant at the time of trial, the evidence does not

meet the requirements of N.C.G.S. § 15A-1415(c).” Rhodes, 366 N.C. at 537, 743

S.E.2d at 40.

 The trial court found that prior to the original trial, “Attorney Webb spoke to

contacts ‘in the street’ who had provided information that led him to believe

Defendant was not involved in the crime.” Knowing this, Webb hired Investigator

Palmer to speak with McCormick, however, McCormick never spoke with

Investigator Palmer. The trial court stated in finding of fact 64 that “Investigator

Palmer attempted to interview William McCormick but was unable to locate him.”

In finding of fact 65, the trial court found that “[h]ad Attorney Webb been able to

locate and interview William McCormick at the time of trial, Webb would have called

him to testify to the information contained in the affidavit.”1

 Webb testified that he had made “contact through some of the people that [he]

knew in the street who brought up the names of other guys that they thought had

[assaulted Graham] . . . the McCormicks names popped up in those conversations.”

 1 The trial court based its conclusion that the information from McCormick was newly
discovered evidence, in part, on a finding that “the details of [McCormick’s] testimony were not known
at the time of trial.” The trial court’s wording is troubling because this is generally true of all testimony
– practitioners and judges do not know what a witness’s testimony will be until the witness actually
testifies. Under the trial court’s interpretation of newly discovered evidence, virtually any information
not originally introduced at trial could qualify as newly discovered evidence, even though it could have
been discovered through other methods or witnesses.

 - 34 -
 STATE V. REID

 Opinion of the Court

Despite having this information, Webb failed to utilize available procedures to secure

McCormick’s statement or testimony. Specifically, Webb did not (1) issue a subpoena,

(2) request a material witness order, (3) request a recess, (4) make a motion to

continue, (5) alert the trial court to the existence of this information, or (6) otherwise

preserve this information in the record at trial. See State v. Smith, 130 N.C. App. 71,

77, 502 S.E.2d 390, 394 (1998) (dismissing defendant’s argument because the

defendant did not avail himself of the methods to procure a witness at trial).

 Webb could have secured McCormick’s attendance to testify at trial by

subpoena. See N.C. Gen. Stat. § 15A-801. In addition, Webb failed to file a motion

for a material witness order. A material witness order is

 an order assuring the attendance of a material witness at
 a criminal proceeding. This material witness order may be
 issued when there are reasonable grounds to believe that
 the person whom the State or a defendant desires to call as
 a witness in a pending criminal proceeding possesses
 information material to the determination of the
 proceeding and may not be amenable or responsive to a
 subpoena at a time when his attendance will be sought.

N.C. Gen. Stat. § 15A-803(a). This method compels a witness to “attend the hearing

by subpoena, or if the court considers it necessary, by order for arrest.” N.C. Gen.

Stat. § 15A-803(g). Therefore, if Webb would have filed a motion for a material

witness order, McCormick could have been compelled to attend and testify at

Defendant’s original trial despite any interference from his mother.

 - 35 -
 STATE V. REID

 Opinion of the Court

 Further, McCormick was actually present at Defendant’s trial. Knowing this,

Webb failed to speak with McCormick despite knowing that McCormick may have

information concerning Graham’s death. In addition, Webb failed to alert the trial

court to the existence of this information, failed to file a motion to continue, request

a recess, or otherwise take steps to procure the information.

 In similar cases, we have rejected a defendant’s motion for a new trial on the

basis of newly discovered evidence when the defendant had an opportunity at trial to

present the evidence through other methods, or the defendant did not use the proper

procedures to preserve the evidence.

 In State v. Beaver, the defendant was convicted of first-degree burglary and

sentenced to life imprisonment. Beaver, 291 N.C. at 138, 229 S.E.2d at 180. The

defendant filed a motion for a new trial on the basis of newly discovered evidence.

The defendant argued that he learned during jury deliberations that a witness was

located prior to trial, and that this witness would testify that defendant was living in

the house which was burglarized. Id. at 142, 229 S.E.2d at 182. Our Supreme Court

found that the witness’ testimony “would only have been cumulative and

corroborative[,]” the defendant “had ample opportunity to examine” the detectives

who located the witness, and the defendant should have filed an affidavit prior to

trial stating that the witness was important and material. Id. at 144, 229 S.E.2d at

183.

 - 36 -
 STATE V. REID

 Opinion of the Court

 Furthermore, in State v. Rhodes, the defendant was convicted of possession

with intent to manufacture, sell, or deliver cocaine and possession of drug

paraphernalia. Rhodes, 366 N.C. at 534, 743 S.E.2d at 38. The defendant’s father

testified at trial but invoked his Fifth Amendment protections when asked whether

the contraband belonged to him. Id. at 537, 743 S.E.2d at 40. After trial, the

defendant’s father made an out-of-court statement that the drugs belonged to him.

Id. at 538, 743 S.E.2d at 40.

 Our Supreme Court determined that this information was not newly

discovered evidence because it “was not evidence which was unknown or unavailable

to the defendant at the time of trial, which could not with due diligence have been

discovered or made available at that time.” Id. at 538, 743 S.E.2d at 40 (citation and

quotation marks omitted). In making this conclusion, our Supreme Court determined

that the evidence could have been presented at trial through a different line of

questioning or even through the examination of another witness. Id. at 538, 743

S.E.2d at 40.

 Accordingly, McCormick’s testimony is not newly discovered evidence because

it was not “unknown or unavailable to the defendant at the time of trial.” Wiggins,

334 N.C. at 38, 431 S.E.2d at 767.

 Closely related is the issue of due diligence. “Due diligence is defined as ‘[t]he

diligence reasonably expected from, and ordinarily exercised by, a person who seeks

 - 37 -
 STATE V. REID

 Opinion of the Court

to satisfy a legal requirement or to discharge an obligation.’ ” State v. Pezzuto, No.

COA02-569, 2003 WL 21037894, at *3 (N.C. Ct. App. May 6, 2003) (quoting Black's

Law Dictionary 468 (7th ed.1999)) (unpublished).

 When the information presented by the purported
 newly discovered evidence was known or available to the
 defendant at the time of trial, the evidence does not meet
 the requirements of N.C.G.S. § 15A-1415(c). Wiggins, 334
 N.C. at 38, 431 S.E.2d at 767. In State v. Powell we found
 no error in a trial court’s conclusion that a defendant failed
 to exercise due diligence when “the defendant knew of the
 statement of [the witness] during the trial” but failed to
 procure her testimony. 321 N.C. at 371, 364 S.E.2d at 336.
 We also agreed there was no newly discovered evidence
 when a defendant learned after trial that his blood sample
 had been destroyed before trial, yet he made no inquiry
 about the blood sample before or during trial. State v.
 Dixon, 259 N.C. 249, 250-51, 130 S.E.2d 333, 334 (1963)
 (per curiam). In another case we agreed there was no newly
 discovered evidence when the defendant learned during his
 trial that two detectives had located his former roommate
 before the trial began. Beaver, 291 N.C. at 144, 229 S.E.2d
 at 183. We wrote: “Defendant had ample opportunity to
 examine [the detectives] as to their knowledge of the
 whereabouts of [his former roommate]. This he failed to
 do.” Id. We further wrote: “[I]f [the] defendant considered
 [the former roommate] an important and material witness,
 he should have filed an affidavit before trial so stating and
 moved for a continuance to enable him to locate this
 witness. This he did not do.” Id.

Rhodes, 366 N.C. at 537, 743 S.E.2d at 40.

 Conclusion of law 13 states that “Defendant used due diligence and proper

means to procure the testimony of William McCormick at Defendant’s original trial.”

 - 38 -
 STATE V. REID

 Opinion of the Court

For the reasons stated above concerning evidence unknown to Defendant, Defendant

failed to exercise due diligence in procuring McCormick’s testimony.

C. Material, Competent and Relevant Information

 The State further argues that the trial court abused its discretion when it

concluded that McCormick’s testimony and affidavit was “competent, material and

relevant. [Because i]t identifies the actual perpetrators of the offense and exculpates

the Defendant.” We agree.

 Hearsay is “a statement, other than one made by the declarant while testifying

at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”

N.C. Gen. Stat. § 8C-1, Rule 801(c) (2019). “Hearsay is not admissible except as

provided by statute or by the[] rules” of evidence. N.C. Gen. Stat. § 8C-1, Rule 802

(2019). McCormick’s testimony concerning Shaw’s purported statements are

inadmissible hearsay. Rule 803 of the North Carolina Rules of Evidence establishes

exceptions to the general exclusion of hearsay evidence. See N.C. Gen. Stat. § 8C-1,

Rule 803 (2019).

 The trial court made the following conclusion of law concerning Shaw’s

statements:

 9. After careful scrutiny, the court concludes that the
 testimony of William McCormick about Robert Shaw’s
 statement regarding the details of Shaw, Bristow and Cox
 assaulting the victim is admissible evidence under Rule
 803(24). First, the State is on notice that Defendant would
 offer such evidence at trial. Second, this hearsay evidence

 - 39 -
 STATE V. REID

 Opinion of the Court

 is not specifically covered by any other exception in Rule
 803. Third, the evidence possesses circumstantial
 guarantees of trustworthiness equivalent to other hearsay
 exceptions because it constitutes an admission of criminal
 conduct by Shaw, is consistent with events actually
 observed by William McCormick the day before, when
 Shaw and the other youths arrived at McCormick’s house
 out of breath having jumped and run from a cab, and is
 consistent with known circumstances of the case, including
 that the victim was assaulted by more than one young male
 person. Fourth, the evidence is material to the case. Fifth,
 the evidence is more probative on the issue of whether
 Shaw, Bristow and Cox, rather than Defendant, were the
 actual perpetrators of these crimes than any other evidence
 procurable by reasonable efforts. Defendant cannot
 reasonably be expected to procure the in-court confession
 of Shaw that Shaw himself is guilty of robber and first
 degree murder. Sixth, admission of the evidence of Shaw’s
 statements will best serve the purposes of the Rules of
 Evidence and the interests of justice. State v. Smith, 315
 N.C. 76 (1985).

 Rule 803(24) of the North Carolina Rules of Evidence allows the admission of

statements that are

 not specifically covered by any of the foregoing [hearsay]
 exceptions but having equivalent circumstantial
 guarantees of trustworthiness, if the court determines that
 (A) the statement is offered as evidence of a material fact;
 (B) the statement is more probative on the point for which
 it is offered than any other evidence which the proponent
 can procure through reasonable efforts; and (C) the general
 purposes of these rules and the interests of justice will best
 be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 803(24). However, “Rule 803(24) is disfavored and should

be invoked very rarely and only in exceptional circumstances.” Strickland v. Doe, 156

 - 40 -
 STATE V. REID

 Opinion of the Court

N.C. App. 292, 299, 577 S.E.2d 124, 130 (2003) (citation and quotation marks

omitted).

 Because of the residual nature of the Rule 803(24) hearsay
 exception and the Commentary's warning that this
 exception does not contemplate an unfettered exercise of
 judicial discretion, evidence proffered for admission
 pursuant to N.C.G.S. § 8C-1, Rule 803(24), must be
 carefully scrutinized by the trial judge within the
 framework of the rule’s requirements.

State v. Smith, 315 N.C. 76, 91-92, 337 S.E.2d 833, 844 (1985) (purgandum).

 For evidence to be admissible under Rule 803(24), the trial court must find six

factors in the affirmative: (1) proper notice had been given; (2) the hearsay is not

specifically covered elsewhere; (3) the statement is trustworthy; (4) the statement is

material; (5) the statement is more probative on the issue than any other evidence

which the proponent can procure through reasonable efforts; and (6) the interests of

justice will be served by its admission. Id. at 92-96, 337 S.E.2d at 844-847. Defendant

failed to satisfy the notice requirement, and so we address only that factor in our

analysis below.

 When hearsay testimony is sought to be admitted as
 substantive evidence under Rule 803(24), the proponent
 must first provide written notice to the adverse party
 sufficiently in advance of offering the statement to provide
 the adverse party with a fair opportunity to prepare to
 meet the statement. The hearsay statement may not be
 admitted unless this notice (a) is in writing; and (b) is
 provided to the adverse party sufficiently in advance of
 offering it to allow him to prepare to meet it; and (c)
 contains (1) a statement of the proponent’s intention to
 offer the hearsay testimony, (2) the particulars of the

 - 41 -
 STATE V. REID

 Opinion of the Court

 hearsay testimony, and (3) the name and address of the
 declarant. Thus, a trial judge must make the initial
 determination that proper notice was duly given and must
 include that determination in the record; detailed findings
 of fact are not required. Should the trial judge determine
 that notice was not given, was inadequate, or was untimely
 provided, his inquiry must cease and the proffered hearsay
 statement must be denied admission under Rule 803(24).

Id. at 92, 337 S.E.2d at 844 (emphasis added) (quotation marks omitted).

 Here, the trial court found that “the State is on notice that Defendant would

offer such evidence at trial.” However, there is no evidence in the record that

Defendant filed a proper notice of intent to offer hearsay evidence pursuant to Rule

803(24) prior to hearing the motion for appropriate relief. Thus, Defendant failed to

satisfy the first requirement of Rule 803(24), and the trial court abused its discretion

when it concluded the written notice requirement had been satisfied. See id. at 92,

337 S.E.2d at 844 (“Should the trial judge determine that notice was not given, was

inadequate, or was untimely provided, his inquiry must cease and the proffered

hearsay statement must be denied admission under Rule 803(24).”).

III. Constitutional Violation

 The State also argues that the trial court erred when it concluded that

Defendant’s due process rights would be violated if he were not allowed to present

McCormick’s testimony at a new trial. We agree.

 “The standard of review for alleged violations of constitutional rights is de

novo. A violation of the defendant’s rights under the Constitution of the United

 - 42 -
 STATE V. REID

 Opinion of the Court

States is prejudicial unless we find that it was harmless beyond a reasonable doubt.

The burden is upon the State to demonstrate, beyond a reasonable doubt, that the

error was harmless.” State v. Guy, 262 N.C. App. 313, 317, 822 S.E.2d 66, 72 (2018)

(purgandum).

 The Sixth Amendment to the United States Constitution, in pertinent part,

states, “[i]n criminal prosecutions, the accused shall enjoy the right . . . to be

confronted with the witnesses against him.” U.S. Const. amend. VI. The Sixth

Amendment applies to the State of North Carolina by way of the Fourteenth

Amendment to the United States Constitution, which states, in part,

 No State shall make or enforce any law which shall abridge
 the privileges or immunities of citizens of the United
 States; nor shall any State deprive any person of life,
 liberty, or property, without due process of law; nor deny to
 any person within its jurisdiction the equal protection of
 the laws.

U.S. Const. amend. XIV.

 Rather than relying on traditional due process principles to determine whether

to grant a new trial for newly discovered evidence, this Court has previously applied

the seven factors required for a new trial as set forth in Beaver. See State v. Hoots,

76 N.C. App. 616, 618, 334 S.E.2d 74, 75-76 (1985) (“Defendant contends that due

process requires a new trial whenever newly discovered exculpatory evidence in the

form of sworn testimony by a confessed perpetrator of the offense is corroborated by

 - 43 -
 STATE V. REID

 Opinion of the Court

independent evidence. This contention is without merit. The standard for granting

a new trial is set out in [Beaver.]”).

 Here, the trial court stated in conclusion of law 18, “In addition, as an

independent ground for decision, denying Defendant the opportunity to present all of

the newly discovered evidence to a trier of fact would, under the circumstances of this

case, violate Defendant’s federal and state constitutional rights to due process of law.”

 However, Defendant has failed to satisfy the Beaver factors discussed above,

and Defendant is not entitled to a new trial. Thus, the trial court erred in concluding

that Defendant’s constitutional rights would be violated if he did not have the

opportunity to present the purported newly discovered evidence.

 Conclusion

 For the reasons stated herein, we reverse the trial court’s order granting a new

trial.

 REVERSED.

 Judge BRYANT concurs.

 Judge DIETZ concurs by separate opinion.

 - 44 -
 No. COA19-205 – State v. Reid

 DIETZ, Judge, concurring.

 This case arrived at our Court on the wrong legal ground for post-conviction

relief. When a defendant who already has been convicted of a crime claims that there

is evidence of his innocence, his postconviction options branch into two paths,

depending on the availability of that evidence at the time of trial.

 If the evidence of innocence could not have been discovered in the exercise of

due diligence at the time of trial, the defendant can bring a claim under N.C. Gen.

Stat. § 15A-1415(c), which addresses newly discovered evidence.

 By contrast, if the evidence could have been discovered in the exercise of due

diligence at the time of trial, but was not, the defendant may pursue a claim for

ineffective assistance of counsel under N.C. Gen. Stat. § 15A-1415(b)(3).

 This case follows the second path. Reid’s trial counsel learned “from the street”

that William McCormick had information that implicated other people, but not Reid,

in the crime. Reid’s counsel even hired an investigator to speak to McCormick. But,

according to Reid’s counsel, “we couldn’t get to him.” This was so, Reid’s counsel

explained, because McCormick’s mother did not want him to get involved with the

investigation.

 As the majority correctly observes, the law provides many options for a

defendant in this situation to secure the testimony of the evasive witness. Indeed,

McCormick was sitting in the courtroom during Reid’s trial, yet Reid’s counsel took

no steps to obtain his testimony despite knowing that it likely was exculpatory. As a
 STATE V. REID

 DIETZ, J., concurring

result, the jury never heard the testimony that McCormick ultimately provided years

later.

 Still, that fact does not make McCormick’s testimony, when it finally came to

light, newly discovered evidence under our post-conviction jurisprudence. Rather, the

failure to secure this testimony at the time of trial implicates Reid’s constitutional

right to the effective assistance of counsel.

 I therefore concur in the majority’s judgment but note that this Court’s holding

does not bar Reid from seeking post-conviction relief on other grounds. The

procedural bar on successive motions for appropriate relief should not apply if the

basis for one claim did not become apparent until the litigation of another.

 -2-